[No. D055646. Fourth Dist., Div. One. Dec. 13, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
WAHID YOSSUF NAZARY, Defendant and Appellant.

## COUNSEL

Susanne C. Washington and Cindi B. Mishkin, under appointments by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Meredith A. Strong, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HUFFMAN, Acting P. J.**—A jury convicted Wahid Yossuf Nazary of embezzlement by an employee (Pen. Code,[1] § 508; count 1) and grand theft by an employee (§ 487, subd. (b)(3); count 2). The trial court sentenced Nazary to two years in prison on count 1 and stayed the sentence on count 2 pursuant to section 654.

---

[1] All statutory references are to the Penal Code unless otherwise specified.

Nazary appeals, contending he cannot be convicted of both grand theft and embezzlement because they are the same crime, or alternatively, grand theft is a lesser included offense of embezzlement, which must be stricken. He also claims the trial court committed prejudicial error in permitting the prosecutor to play a videotaped confrontation with him in his private workplace office in violation of section 632 and his privacy rights, in denying his motion to strike the testimony of a witness at trial, and in overruling hearsay objections to certain receipts admitted into evidence. Nazary finally asserts the cumulative effect of the multiple evidentiary errors denied him due process and a fair trial. We affirm.

## FACTUAL BACKGROUND

From 2002 to the end of 2006, Nazary was the onsite manager of an Atlantic Richfield (ARCO) gas station (the ARCO station or the station) located in Oceanside, California, owned by K.A. Management (K.A.), an investment corporation named after its owners, Kayvan Agahnia (Kevin), Kareem Assi, and Kambiz Agahnia, who also owned and operated other gas stations, convenience stores and carwashes in San Diego County. Nazary was charged with the current theft offenses after an investigation revealed large discrepancies between the cash amounts received by the station and those deposited in the station's bank account during the period from January 1, 2005, through November 1, 2006.

At trial, Anthony Casarez, K.A.'s director of operations, who also was the supervisor overseeing Nazary's immediate field supervisor, testified about the unique way business was conducted in the ARCO gas station industry in general as well as the specifics of the discovery and investigation of the theft in this case. Casarez explained that all ARCO franchise stations, including the one in Oceanside, which he had opened for K.A. as manager in 1999, had outside "Pay Island Cashiers" or "PIC" machines on the island where the pumps are located that take cash or debit cards, which enable a customer to either swipe a debit card or place cash directly into the machine and obtain the equivalent amount of gas to fuel their vehicle. Each PIC machine is equipped with a validator that reads the bills to verify the denomination and a computer system that keeps track of the cash, which is then deposited into an internal canister. When the canister is removed, the PIC machine stops its running calculation of the cash amount inside its canister and resets to zero. The software in each PIC machine connects it with the main register inside the ARCO station, allowing that register to keep a running tally of all sales for the station.

Casarez noted that due to K.A.'s franchise agreement with ARCO and for security reasons, the eight canisters filled with cash inside the PIC machines at the ARCO station could not be accessed by K.A. employees or the station's manager. Rather, ARCO relied on third party armored transport companies to remove the PIC canisters containing cash and to replace them with empty canisters at their stations. The armored transport company hired to complete these tasks at the ARCO station in this case usually came three times a week to pull and replace the canisters.

When the armored transport company arrived at the station, one of their employees would initially retrieve a set of empty PIC canisters from the manager, then use a key to open the slide bar mechanism on the PIC machines to expose the full canisters containing cash. Neither the manager nor the station employees had a key to open the mechanism to gain access to the canisters in the PIC machines. After removing or pulling all eight canisters, the armored transport company employee would replace them with the empty canisters and generally also print a receipt, which detailed the amount of cash that had registered in each of the canisters since the last time they were pulled, and deliver the full canisters and printed PIC receipt to the station manager's office.[2] In exchange, the manager would give the armored transport company employee cash from the previous pull in bank deposit bags to take to the central vault at the Union Bank of California.

Basically, after each visit by the armored transport company, the station manager counted the amount of cash inside each canister to ensure that it matched the corresponding PIC receipt, bagged the money from the PIC machines separately from the "normal" cash deposits from the station's minimart register, and placed it in the station's safe until the armored transport company's next arrival. The manager would sign the PIC receipt and generate a deposit slip indicating the amount of cash removed from the PIC machine canisters to be taken to the bank and also fax a copy of the PIC receipt and deposit slip to K.A.

Casarez further explained that the sensors inside the PIC machines, which calculated how much money was in each canister at the time of a pull and printed that amount on the receipt, were sensitive and would sometimes malfunction due to the speed and force with which the armored transport company's employee removed them. On those occasions, the printed receipt would not show a count for a canister that had not registered as pulled. However, because the PIC machines kept a running total of cash received in a particular canister until it registered as being pulled, the next time the

---

[2] The receipts could also be printed at the main cash register.

armored transport company employee pulled the canister and the sensor detected the pull, the receipt would show a cash amount in that canister greater than the actual cash it contained. In addition, the validator in the PIC machines would occasionally not register a bill that had been deposited in a canister, which would result in a slight discrepancy between the PIC machine's running account of the cash inside the canister and the actual amount it contained.

If any of the PIC machine malfunctions was chronic, the manager of the station was instructed to call CETEC Solutions (CETEC) to come service and repair the PIC machines. Further, whenever there was a "pull error" where the PIC receipt indicated that one or several of the canisters had not registered as having been pulled, the station manager was instructed to open the unregistered canisters, count the cash inside each and write that total amount on the receipt for each such canister. At the next canister pull, when the receipt showed the total of the unregistered pull and the registered pull, the manager of the station was supposed to ensure that the numbers added up, with the amount depicted on the most recent receipt equaling what was pulled previously plus what was currently inside the canister. Eventually, the accuracy of these figures, that were in a so-called "suspense account," which accounted for any minor swings in shortages or overages of the PIC machine cash, would be verified by K.A.'s independent accounting firm, Ramineh, Fani & Nowakhtar (RFN).

While Nazary was manager of the ARCO station, Casarez became aware that his counting of the cash from the PIC machine canisters varied slightly from the usual policy employed by K.A. of having the manager or assistant manager and another person, i.e., two people, immediately count the cash, put the money in the station's main safe near the register, and have both people sign the receipt and deposit slips for the next deposit. Nazary and his assistant manager would often not immediately count the money, usually using both days before the next armored transport company's arrival to count the PIC cash, often had only one person count the money and sign the receipt and deposit slips instead of two, and placed the money in a file cabinet in the closet of the manager's office rather than the station's safe.[3] Although Casarez and Nazary's direct supervisor had both asked Nazary to complete the money counting procedure according to company policy, he never complied.

---

[3] Nazary's assistant manager Jose Lopez, who had been trained by Nazary, confirmed in his testimony the counting procedure used by Nazary, noting sometimes both counted the money and sometimes each alone. Regardless, whoever did the counting of the money also did the paperwork and signed the PIC receipt and deposit before the money went to the bank.

During the first quarter of 2006, RFN, which had completed its 2005 yearend financial analysis for K.A., notified Kevin, one of K.A.'s owners, that there had been a continuous and abnormal growing of the shortages in the suspense account at the ARCO station. Kevin, in turn, contacted Casarez to call CETEC to get third party verification that the PIC system at the station was working properly and asked Bryan Jones, who was the director of finance and administration for K.A. in 2005 and 2006, to conduct an internal financial investigation. After CETEC verified the PIC machines were working properly and Jones's investigation concluded there was probable "employee theft" by Nazary, Casarez and K.A.'s owners contacted the Oceanside Police Department. After discussing the matter with Detective Brian Mahr, who was assigned to the case, Casarez set in motion a "forensic audit" Mahr wanted performed.

In addition, Casarez along with the owners collectively decided "to install video surveillance inside the manager's office" at the ARCO station. Thus while Nazary was on leave during September 2006, three cameras and an audio device were installed in the ceiling of the office without his knowledge so that footage could be recorded, saved and monitored remotely. Casarez also had the locks on the doors in the office changed during Nazary's absence, retaining keys for himself and the owners.

On October 3, 2006, Nazary's first day back at work following his vacation, Casarez gave him a set of the new keys and a letter detailing the status of the business as it was handed back over to his care. Casarez later confirmed that the surveillance cameras were working properly and that he could see and hear what was happening in the manager's office that first day. However, the recording the next day was cut short because Nazary was observed spackling over the holes containing the cameras. Consequently, on October 8, 2006, Casarez had two new cameras installed in the office's ceiling vents without Nazary's knowledge.

Casarez and the owners of K.A. also decided to do a "precount" of the PIC money from the canisters in an effort to uncover the theft and prevent Nazary from having access to the money. Because the armored transport company had come on October 6, 2006, and was not scheduled to come to the station again until October 11, 2006, due to the Monday Columbus Day holiday, meaning the canisters would have accumulated a larger amount of money than usual, Casarez and the owners planned to start the so-called "precount sting operation" or plan for the October 11 scheduled pickup.

According to the plan, Kevin would pick up Nazary at the station and take him to "research" carwash locations in the area while Casarez met the armored transport company employees at the station, received the canisters

from the PIC machines, counted the money inside each and replaced the cash inside the canisters so that when Nazary later counted the money, it could be determined whether his figures matched those arrived at in Casarez's precount.

The precount sting on October 11, 2006, however, did not go as planned. Although Nazary was off the premises, Casarez's attempt to gain access to the canisters locked inside the closet in the manager's office failed as his key to the closet would not work. Looking around the office, Casarez then found a receipt from a locksmith indicating that Nazary had had the locks in the office changed again that morning. Casarez called the owners of K.A. and Detective Mahr explaining the situation, and they in turn explained the situation to the locksmith company, which then sent a representative to meet Casarez and give him a copy of the new key. At this point, because there was not enough time to complete the precount of the cash in the canisters, Casarez abandoned the plan and stayed onsite to count the large sum of money with Nazary when he returned to the station. Although there were several pull errors that day, no major discrepancies were noted and Casarez took the deposit of roughly $39,000 from the PIC machine canisters directly to the bank.

The second try to execute the plan on October 13, 2006, was successful. After Nazary was taken offsite, Casarez arrived at the station, precounted the cash in the canisters from the PIC machines in view of the surveillance cameras and while he was on the telephone with Kevin, and then replaced the money as it had been inside the various canisters. Nazary was later filmed counting the same canisters. The PIC receipt for this pull, entered into evidence as exhibit 28, showed that canisters 5, 6 and 7 did not register. Casarez's precount total of the amount of cash in canisters 5, 6, and 7 that day was admitted into evidence as exhibit 29.

A similar precount plan was executed on October 16, 2006, with Nazary's direct supervisor doing the precount rather than Casarez, while Casarez watched the videotape of the precount and talked with the supervisor by phone. On that date, canisters 5, 6 and 7 appeared on the PIC receipts, which were entered into evidence as exhibits 32 and 33, and exhibit 31 was entered into evidence showing the supervisor's precount totals.

K.A. and Casarez then compared Nazary's counts for October 13 and 16, 2006, to the precounts performed by Casarez and Nazary's supervisor. Both the precounts and Nazary's counts were then compared to the PIC receipts, but Nazary's totals indicated the canisters actually contained $1,570 less than what was indicated on the PIC receipt. For canister 6, again the precount of the accumulated cash matched the October 16 PIC receipt, but Nazary's count showed a loss of $240. For canister 7, the precount showed $1 more

than what was indicated on the PIC receipt while Nazary's count demonstrated a loss of $100. In total, Nazary's account of the cash in canisters 5, 6 and 7 written on the receipt on October 13, 2006, was $1,910 less than Casarez's precount total.

The same type of comparison was performed for the PIC receipt from October 6, 2006, which was entered into evidence as exhibit 34 and showed canisters 5, 6, and 7 did not register as pulled, and the receipt for October 11, 2006, which was entered into evidence as exhibit 17 that registered those canisters. Consequently, the total printed on the PIC receipt for such canisters on October 11, 2006, should have equaled the cumulative total of the amounts that were manually counted by Nazary on October 6 for them plus the amounts that were manually counted for those canisters by Nazary and Casarez on October 11, 2006. Instead of matching, Nazary's figures showed a total shortage of $1,911 for canisters 5, 6 and 7.

After the precount comparisons revealed significant discrepancies, Casarez along with two of K.A.'s owners, Kevin and Assi, confronted Nazary in the station manager's office on October 23, 2006, about the shortages. During the confrontation, which was captured on camera, Casarez and the owners told Nazary they knew he had stolen $227,000, showing him the Excel spreadsheets on a laptop that reflected the losses to K.A., and explained about the sting operation of precounts used to prove the theft. Although a redacted videotape of the confrontation was played for the jury, Casarez, who testified about the contents of the conversation, said Nazary denied any involvement in the theft of K.A. funds, and noted that he was sweating, fumbling with his cell phone and slapping himself in the head in disbelief during the confrontation, which ended abruptly when he ran out to his car and left the station.

William Stegall, a manager/supervisor of CETEC, who was responsible for overseeing the technology of the ARCO gas station point-of-sale system (the main register inside the minimart) and debit and credit devices as well as the outside PIC machines, testified at trial about being contacted by Casarez about the cash shortage problem at the station in this case. After describing his experience and training for maintaining the hardware both inside and outside the ARCO stations, his familiarity with installation of the software and hardware for all the stations, both the electronic and mechanical sides of the various machines used at the stations in the five-state area over which he managed, including California, and his daily contact with ARCO's technicians who called him for troubleshooting advice as they worked on the various machines, Stegall explained to the jury the electronic side of the PIC machines and how they mechanically worked in conjunction with the inside

point-of-sale system. Stegall's explanations included describing the card reader, printer and cash acceptor and validator for the PIC machines and why the receipt from a machine might reflect a pull error if any of the three switches necessary to activate the pull registering for a particular canister was not working properly.

In response to Casarez's request to check the PIC machines at the station, Stegall had arranged for two of his "top" technicians to test every sensor, every switch and every wire of those machines. Stegall, who then reviewed their paperwork of the inspection and talked with them, explained that his technicians ran a general diagnostic of the entire main board on each device, testing all of the voltages, all of the wires for continuity, every door switch and every other switch in each machine. Although the technicians had found a few switches that needed to be replaced, which probably caused the canister pull error problem, Stegall testified that those problems would not have accounted for the cash shortages at the station. Moreover, even though CETEC did not review the software as part of the inspection, Stegall said that K.A. had not reported any additional problems with cash shortages in the PIC machines since that time.

Jones, who had been asked to conduct an internal investigation of the matter, testified he started by reviewing all of the financial documents from 2005, including those that had been received by K.A. from RFN. After ruling out any accounting or clerical errors, he narrowed down the problem of cash shortages as coming from the PIC machines because the bank deposit information did not correspond with the PIC sales receipts. When Jones contacted CETEC and determined there was no problem with the PIC machine software, he went back and compared all of the PIC receipts with the actual deposits made to the bank. Doing so, Jones discovered that the problem was originating from the times when manual corrections to the PIC receipts were necessary because they did not register certain canister pulls, and the amount of cash had to be written in by hand. Jones created an Excel spreadsheet (exhibit 40) for the period from January 2005 through November 2006, detailing the amount of cash the deposit slips indicated should have been received versus what cash was physically deposited in the bank. He also compared the shortages to Nazary's work schedule and determined that the significant shortages only occurred when Nazary was working, and there were either overages or slight acceptable shortages when he was not working. Jones calculated the total amount of loss suffered by K.A. attributable to the PIC machine issue was $227,000.

Karen Kaseno, a certified public accountant (CPA) and fraud examiner, testified her CPA firm had been contacted by K.A. to perform an extensive forensic audit of the cashflow problem at the ARCO station and to review the

financial analysis Jones had prepared regarding the matter. Kaseno was given Jones's spreadsheets, all the deposit slips and PIC receipts from January 2005 to November 2006 and asked to independently determine whether she thought there was a possibility of theft and whether the records K.A. had compiled were correct. After completing her own analysis, including the dates on which Nazary was working and those on which he was not, Kaseno concluded there was no significant cash loss during the times Nazary was not at the station and that the cash loss when he was present matched that found by Jones, totaling $227,000.

Finally, one of the K.A. owners, Kevin, testified in the prosecution case against Nazary, essentially confirming much of Casarez's and Jones's testimony about their suspicions that Nazary was committing theft of cash from the ARCO station's PIC machines and the subsequent investigation involving the surveillance cameras at the station, precount sting operation and confrontation in the manager's office. Kevin added that as Nazary was running to his car after the confrontation, he shouted to him, asking him what was happening and Nazary shouted back as he drove off that he would call him. Nazary did so later that day, telling Kevin, "Give me some time. I'll pay you half the money. Just give me some time." Because Kevin was going out of town, he told Nazary to call owner Assi and "coordinate this thing and do what you say."

Nazary subsequently called Assi requesting a couple of days to allow him to pay back half of the money. Assi gave Nazary a deadline and then called him when he failed to meet that deadline, asking him to call back. When Nazary failed to repay any of the money or call back one of the owners, Kevin contacted the police and talked with Detective Mahr to update him on their further investigation regarding the losses at the station.

Nazary provided no defense at trial, resting on what he termed "the insufficiency of the evidence."

DISCUSSION

I

*CONVICTIONS FOR GRAND THEFT BY EMPLOYEE AND*
*EMBEZZLEMENT*

Nazary contends that as a matter of law he cannot be convicted of both embezzlement in violation of section 508, and grand theft by an employee in violation of section 487, subdivision (b)(3), because embezzlement is no longer an independent crime; rather, like grand theft by an employee, it has

been combined into the single statutory definition of theft under section 484. Alternatively, Nazary claims that because grand theft by an employee is a necessarily lesser included offense of embezzlement that falls within the exception to the general rule permitting multiple convictions, his conviction on the count 2 grand theft by an employee must be stricken. As we explain, neither assertion has merit.

## A. Different Theft Crimes

Nazary's argument that the crimes of embezzlement and grand theft by an employee are one in the same is essentially premised upon the history and origin of the theft and larceny statutes. "Prior to the amendment of . . . section 484 in 1927, the criminal law recognized three types of nonforcible takings of the property of another: larceny, a common law crime, and the statutory offenses of embezzlement and obtaining title by false pretenses. [Citations.]" (*People v. Brock* (2006) 143 Cal.App.4th 1266, 1274 [49 Cal.Rptr.3d 879] (*Brock*).) After the 1927 amendment, the Legislature "consolidated the offenses of larceny, larceny by trick, obtaining money by false pretenses, embezzlement, and related theft offenses, in section 484 as the single crime of 'theft.' [Citations.]" (*People v. Sanders* (1998) 67 Cal.App.4th 1403, 1416 [79 Cal.Rptr.2d 806] (*Sanders*).) Since then, section 484, subdivision (a) has stated: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft."

"In an effort to further clarify its intent to bring all of the theft crimes under one umbrella," section 490a was also enacted in 1927 and provides that " '[where]ver any law or statute [of this state] refers to or mentions larceny, embezzlement, or stealing, said law or statute shall . . . be read and interpreted as if the word "theft" were substituted therefor.' " (*Sanders, supra,* 67 Cal.App.4th at p. 1416.) Although the purpose of these legislative changes was to " 'remove technicalities' that existed in pleading and proof of theft crimes which existed at common law [citation], it was also determined that none of the elements of the several crimes assembled under the term 'theft' had been changed. [Citation.]" (*Ibid.*) Thus, as our Supreme Court in *People v. Davis* (1998) 19 Cal.4th 301 [79 Cal.Rptr.2d 295, 965 P.2d 1165] (*Davis*) explained, even though the consolidation of the theft offenses was intended to

abolish "most of the procedural distinctions between those offenses," it did not intend to abolish the substantive distinctions of those offenses. (*Id.* at pp. 304–305.)

■ "A practical consequence of the 1927 amendments was to permit the charging of the crime of theft, regardless of the common law theory, by alleging that the defendant unlawfully took the property of another [citation]. . . . This rule of simplicity in pleading does not alter the elements of proof required. Those elements depend upon the type of theft committed. [Citation.] [¶] . . . [S]implicity in pleading is not mirrored by simplicity in proof. Simplicity in pleading does not replace the requirement that the elements of a legislatively defined crime must be established by the evidence. [Citations.]" (*Sanders, supra,* 67 Cal.App.4th at p. 1416, fn. 18.)

In other words, the combination of "several common law crimes under the statutory umbrella of 'theft' did not eliminate the need to prove the elements of the particular type of theft alleged. [Citations.]" (*Sanders, supra,* 67 Cal.App.4th at pp. 1416–1417.) "Although the offense of theft has been substituted for the offenses of larceny, embezzlement and obtaining money or property by false pretenses, no elements of the former crimes have been changed. The elements of the former offenses of embezzlement and larceny and the distinction between them" continue to exist. (*People v. Tullos* (1943) 57 Cal.App.2d 233, 237–238 [134 P.2d 280] (*Tullos*); see *Davis, supra,* 19 Cal.4th at p. 304.) Thus, even after the amendment of section 484, "elements of the several types of theft included within section 484 have not been changed . . . ." (*People v. Ashley* (1954) 42 Cal.2d 246, 258 [267 P.2d 271]; see *Brock, supra,* 143 Cal.App.4th at p. 1275.)

Nazary argues that based upon the merger of the theft offenses in section 484, he can only be convicted of one act of theft, and embezzlement is merely another theory of theft and not an independent offense. His argument is meritless because the elements of embezzlement and grand theft by an employee, and the distinction between them, continue to exist. (*Tullos, supra,* 57 Cal.App.2d at pp. 237–238; *Davis, supra,* 19 Cal.4th at p. 304.)

■ The offense of grand theft by an employee is essentially the same as the offense of grand theft by larceny, with the additional finding that the defendant was an employee of the victim. (See CALCRIM Nos. 1800, 1803.) "The elements of theft by larceny are well settled: the offense is committed by every person who (1) takes possession (2) of personal property (3) owned or possessed by another, (4) by means of trespass and (5) with intent to steal the property, and (6) carries the property away. [Citations.]" (*Davis, supra,*

19 Cal.4th at p. 305; see also CALCRIM No. 1800.) The element of trespass is satisfied by the act of taking the property from the possession of another and the intent to steal element is an intent to permanently deprive the owner of the use or enjoyment of the property. (*Davis, supra*, 19 Cal.4th at p. 305.)

■ As for embezzlement, such offense "is the fraudulent appropriation of property by a person to whom it has been intrusted." (§ 503.) A conviction for embezzlement "requires conversion of trusted funds coupled with the intent to defraud. [Citations.] An intent to deprive the rightful owner of possession even temporarily is sufficient and it is no defense that the perpetrator intended to restore the property nor that the property was never 'applied to the embezzler's personal use or benefit.' [Citations.]" (*In re Basinger* (1988) 45 Cal.3d 1348, 1363–1364 [249 Cal.Rptr. 110, 756 P.2d 833].) "The crime of embezzlement requires the existence of a 'relation of trust and confidence,' similar to a fiduciary relationship, between the victim and the perpetrator." (*People v. Wooten* (1996) 44 Cal.App.4th 1834, 1845 [52 Cal.Rptr.2d 765].) Embezzlement by an employee requires evidence that the property came into the control of the "clerk, agent, or servant" by virtue of his employment. (§ 508; *People v. Sprado* (1925) 72 Cal.App. 582 [237 P. 1087].) " 'The gist of the offense is the appropriation to one's own use of property held by him for devotion to a specified purpose other than his own enjoyment of it.' [Citation.]" (*People v. Creath* (1995) 31 Cal.App.4th 312, 318 [37 Cal.Rptr.2d 336].)

■ Nazary does not challenge the sufficiency of the evidence to support either his conviction for embezzlement by an employee or his grand theft by an employee conviction arising out of his employment at the ARCO station during the period between January 1, 2005, and November 1, 2006. Because the jury had to find different intents and elements supported by the evidence for each offense, and as noted above, the distinctions between the theft offenses in section 484 were not affected by the consolidation of those offenses generally (*Davis, supra*, 19 Cal.4th at p. 304), we conclude Nazary was properly convicted for both offenses.

Nazary's reliance on this court's decision in *People v. Tabb* (2009) 170 Cal.App.4th 1142 [88 Cal.Rptr.3d 789] to argue otherwise is misplaced. The defendant in *Tabb* was not convicted of embezzlement in addition to grand theft by an employee as in this case. Nor did the prosecutor in this case pursue " 'a single, overall plan or objective' " theory as in *Tabb*. (*Id.* at p. 1148, fn. 4.) Consequently, our analysis in *Tabb* is readily distinguishable. In addition, Nazary's citation to the recently decided case, *People v. Fenderson* (2010) 188 Cal.App.4th 625 [116 Cal.Rptr.3d 17] (*Fenderson*), as

support for his position is also unfounded. The court in *Fenderson* merely determined that a grand theft conviction would be upheld if any of the theft offenses in section 484 was proven by the evidence and did not consider the question of whether two separately charged convictions could be upheld if there was evidence to warrant both.

### B. *Multiple Convictions When One Is Not a Lesser Included Offense*

Alternatively, Nazary contends his convictions for both embezzlement by an employee and grand theft by an employee are improper because one crime is a lesser included offense of the other. We disagree.

 "In general, a person may be *convicted* of, although not *punished* for, more than one crime arising out of the same act or course of conduct. 'In California, a single act or course of conduct by a defendant can lead to convictions "of *any number* of the offenses charged." [Citations.]' [Citation.] Section 954 generally permits multiple conviction. Section 654 is its counterpart concerning punishment. It prohibits multiple punishment for the same 'act or omission.' " (*People v. Reed* (2006) 38 Cal.4th 1224, 1226–1227 [45 Cal.Rptr.3d 353, 137 P.3d 184].) "A judicially created exception to the general rule permitting multiple conviction 'prohibits multiple convictions based on necessarily included offenses.' [Citation.] '[I]f a crime cannot be committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.' [Citation.]" (*Id.* at p. 1227.) In determining whether a defendant has been improperly convicted of multiple charged offenses, we only consider the statutory elements of the offenses challenged as improper. (*Id.* at p. 1231.)

 Here, Nazary has failed to cite any reported authority holding that grand theft larceny by an employee is a necessarily included offense of embezzlement by an employee. Even though embezzlement by an employee and grand theft larceny by an employee are both species of the crime of theft (see § 490a), neither one is a lesser included offense of the other because each contains elements not contained in the other offense. (Compare CALCRIM No. 1800 with CALCRIM No. 1806.) The additional element of an employee aside, grand theft by larceny requires that certain money, labor or real or personal property be "taken" by the defendant (§ 487, subd. (a); see CALCRIM No. 1800), whereas the chapter of the Penal Code relating to embezzlement clarifies that a "distinct act of taking is not necessary to constitute embezzlement" (§ 509). Further, the crime of embezzlement has as one of its elements that property has been fraudulently appropriated by "a person to whom it has been entrusted" (§ 503; see CALCRIM No. 1806), while grand theft by larceny does not require fraudulent appropriation or an

entrustment of property to the defendant (§ 487, subd. (a); see CALCRIM No. 1800).

Accordingly, we conclude Nazary was properly convicted of both grand theft by embezzlement and grand theft (larceny) by an employee.

II

## EVIDENTIARY RULINGS

Nazary also contends the trial court committed various evidentiary errors which either alone or together prejudicially affected his trial rendering it unfair and a denial of due process. We address these in turn.

### A. *The Videotape*

In limine, Nazary brought a motion to exclude from evidence certain portions of videotapes obtained by hidden cameras in the manager's office of the ARCO station without his knowledge or consent. He outlined four parts of the videotapes he anticipated the prosecutor would seek to play at trial, noting he had no objection to the admission of the portions showing Casarez counting money during the sting operation or himself counting money and placing it in the room's closet. Rather, Nazary only objected to the parts that purportedly showed him inhaling smoke from aluminum foil while speaking with another person in the office and the one showing the confrontational meeting between him and the three representatives from K.A. As to these portions, Nazary complained they were confidential communications whose admission into evidence was prohibited under section 632. He specifically argued that the admission of the portion showing him inhaling smoke would also violate his due process rights because he had a right to privacy in the manager's office during those times the room was not used to count currency and it should further be excluded under Evidence Code sections 1101, subdivision (a) and 352 as prejudicial uncharged misconduct, which was not relevant to any motive for the alleged embezzlement and grand theft over the 22-month period.

At the hearing on the matter, after the trial court noted it had read Nazary's motion and was tentatively denying it, Nazary's counsel provided further argument, essentially stating Nazary's position was that he had a reasonable expectation his private conversation with the K.A. management during the confrontation in the manager's office was not being recorded and that with regard to the purported narcotics portion he had a reasonable expectation of privacy even though it was not an oral communication. In response to the drug portion of the videos, the prosecutor explained it would be using it to

show Nazary's motive to commit these financial crimes, along with evidence of his income, how much heroin costs and how much he was buying of the drug.

Although the court then ruled it was denying Nazary's motion as it related to the videos under section 632, it proceeded to hear argument on whether the drug portions of the videotapes would be admissible under the Evidence Code. When the court noted it was recessing to read cases submitted by the parties on the issue, Nazary's counsel asked the court to also consider the separate issue as to how the confrontation video, which was about 48 minutes long and focused from the top down on Nazary showing "a lot of a bald head, and . . . some fidgeting around, but that's essentially what you see . . . ," would be presented to the jury. Counsel believed that if that portion of the video was played silently while a witness testified about what was being said, then it would not have any relevance.

When the court asked the prosecutor how he intended to proceed, the prosecutor explained that there was a lot of extraneous standing around on the 48-minute videotape, but the key moments reflect that Nazary was confronted "with the videotape of him using drugs in the office and . . . lying about it and then being confronted with the buying of the drugs and then same thing with the thefts. [¶] And at the end, after a rather lengthy confrontation about the thefts and being presented with all of the evidence that the people from K.A. Management had generated, not only the video evidence but the documentary evidence, the defendant then flees the premises." The prosecutor intended to crop the 48-minute video into about a 10-minute video to show the three key portions and have Casarez describe what the jury was seeing "in each clip."

When Nazary's counsel then objected that such procedure would give a false impression of the meeting by taking things out of context and opined that if the video were played with its audio component that a transcript needed to be prepared, the court ruled under Evidence Code section 352, subdivision (a) that it would not review the 48-minute tape at that time, but would wait to review the edited portion that the prosecutor wanted to have admitted into evidence. The court further ruled that the prosecutor would prepare a transcript for such edited portion and noted the court would entertain any defense objections outside the jury's presence to such edited version at that time. The court continued the matter regarding the drug portions of the tape until the next morning to further research the matter.

At that time, the court ruled it was "excluding the videotape of the drug usage and the drug purchase" under both Evidence Code sections 1101 and 352, subdivision (b), which also included any testimony relating to those

incidents. The prosecutor noted that he had a transcript for a redacted 10-minute 48-second version of the original video and also a five-minute shortened redacted version that did not include the portions relating to the drugs for which he would shorten the transcript. The court left review of the shortened redacted video and transcript for Nazary's counsel.

Near the end of Casarez's testimony at trial, the shortened redacted videotape of the confrontation in the manager's office was played for the jury as they followed along with corrected transcripts that deleted any mention of the drugs.

On appeal, Nazary complains that the trial court abused its discretion in admitting into evidence the shortened redacted confrontation video, arguing such admission was a violation of section 632 and his constitutional right to privacy. We disagree.

■ "Section 632, subdivision (a), provides that it is a crime to 'intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrop[] upon or record[] the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.' Subdivision (d) of section 632 prohibits such recordings from being admitted in judicial proceedings." (*People v. Nakai* (2010) 183 Cal.App.4th 499, 517 [107 Cal.Rptr.3d 402] (*Nakai*).)

For purposes of section 632, "communication" includes conduct in addition to oral or written dialogues (*People v. Gibbons* (1989) 215 Cal.App.3d 1204, 1209 [263 Cal.Rptr. 905]), "a video recorder . . . is a recording device . . ." (*id.* at p. 1208), and the term "confidential communication" includes "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made . . . in any . . . circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." (§ 632, subd. (c); see *Flanagan v. Flanagan* (2002) 27 Cal.4th 766, 774 [117 Cal.Rptr.2d 574, 41 P.3d 575] (*Flanagan*).)

Although we usually review a trial court's decision to admit or exclude evidence for an abuse of discretion (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618]), where, as here, the record does not reflect the trial court exercised its discretion in making its ruling regarding section 632, but rather reveals it determined as a matter of law that the facts of the case did not constitute a violation of that section, we apply the standard of review associated with rulings on motions to suppress evidence,

essentially conducting a de novo review applying section 632 to the agreed-upon facts of this case. (*Nakai, supra*, 183 Cal.App.4th at pp. 516–517.)

Doing so here, we note that although Nazary may have desired any communications with the owners of K.A. and Casarez during the confrontation be kept confidential, the circumstances of the communication were such that Nazary could reasonably expect that they might be overheard or recorded. Nazary was aware of K.A.'s continuing interest in ensuring the safety and security of their property, which had led it to install video surveillance equipment for other areas of the station, including the interior of the minimart, the outside of the premises, and the gas pump islands and the PIC machines. He was also given notice that he was under suspicion when he returned from leave on October 3, 2006, by Casarez giving him a new set of keys for the manager's office and the closet/safe and requiring him to sign a letter regarding the status of the cash in the closet/safe ready for deposit at the next armored transport company's scheduled pickup, which was unusual. Nazary further was aware that cameras had been installed in the ceiling of the manager's office during his absence, plastering over them as soon as he knew of their existence. Moreover, during the confrontation, Nazary was made aware of the evidence against him by the owners and Casarez showing him video proof of his misconduct in the office. Under these circumstances, it was not objectively reasonable for Nazary to expect the communications during the confrontation regarding his embezzlement of cash from the station's PIC machines to be confidential and not overheard or recorded. (*Flanagan, supra*, 27 Cal.4th at p. 775; *Frio v. Superior Court* (1988) 203 Cal.App.3d 1480, 1488 [250 Cal.Rptr. 819].) Therefore, the videotaped communications during the confrontation on October 23, 2006, in the ARCO station manager's office were not "confidential communications" that are protected by section 632.

Accordingly, the trial court did not err by denying Nazary's motion to exclude or suppress the videotaped evidence of the confrontation. Nazary's reliance on *Coulter v. Bank of America* (1994) 28 Cal.App.4th 923 [33 Cal.Rptr.2d 766] to find otherwise is inapposite. *Coulter* is readily distinguished by its facts, which involve an employee of the bank recording others in their private offices and not the employer, as here, who has the "lawful right and duty to guard against misuse of [its] property" to record others for guarding against criminal activity. (*People v. Soles* (1977) 68 Cal.App.3d 418, 421 [136 Cal.Rptr. 328], disapproved on another point in *Ribas v. Clark* (1985) 38 Cal.3d 355, 360 [212 Cal.Rptr. 143, 696 P.2d 637].)

Moreover, to the extent an error could be found in the court's denial of Nazary's motion to exclude the video, the error was clearly harmless. "When determining whether a trial court's erroneous decision regarding a motion to [exclude or] suppress confidential communications [under section 632] was

prejudicial to the defendant, we must decide if it is reasonably probable that a result more favorable to the defendant would have been reached in the absence of the error. [Citation.]" (*Nakai, supra,* 183 Cal.App.4th at p. 519.)

Here, the five-minute shortened redacted video of the confrontation provided little evidence of the embezzlement and theft, predominately showing consciousness of guilt by Nazary who was accused of the offenses. Casarez's testimony regarding the precount sting operations, his testimony in conjunction with that of Stegall regarding the PIC machines and the testimony from Jones and Kaseno established that the crimes had taken place. The contents of the recorded conversations were also admitted through witness testimony, with Casarez testifying to Nazary's denial of any theft and his behavior during the confrontation, and Kevin testifying about Nazary's behavior at the close of the confrontation as he fled the scene and asked to be permitted to repay some of the money. Kevin further added that Nazary called him and another owner asking each for more time to do so. In light of this evidence, which includes Nazary's implied admissions, it is not reasonably probable that a result more favorable to Nazary would have been reached had the video not been admitted.[4]

### B. *Stegall's Testimony*

During Stegall's testimony, after he had explained his qualifications and experience with regard to the maintenance of the hardware and software used to run the PIC machines for over 200 gas stations in the western United States, had described in detail the hardware of the PIC machines, had explained how the machines worked, and had described the testing of the machine's hardware at the ARCO station by his two top technicians, Nazary's counsel objected on the basis of "lack of foundation of personal knowledge." The trial court denied Nazary's implied motion to strike Stegall's answer to the last question as to what the technicians had done, stating the answer would stand and the prosecutor could ask the next question. Then later on cross-examination, after Stegall confirmed that he did not do the actual testing on the PIC machines and was not present when his technicians did the testing, Nazary's counsel renewed his motion to strike Stegall's testimony about the testing of the PIC machines on grounds that testimony was hearsay. The court again denied the motion to strike, saying Stegall's testimony would remain.

On appeal, Nazary asserts the trial court committed reversible error by denying his motions to strike that portion of Stegall's testimony regarding the

---

[4] Because we conclude there was no error in admitting the videotape of the confrontation, and no possibility of prejudicial error, we decline to engage in the Proposition 8 debate with regard to whether the amendments to section 632 affected the truth-in-evidence provision of the proposition.

testing of the PIC machines because a proper foundation showing Stegall's personal knowledge of the matter was not shown and his testimony merely consisted of inadmissible hearsay. In his reply brief, Nazary objects to the People supporting the court's rulings as being proper under the theory that Stegall was testifying as an expert witness on the issues of the testing and the proper working of the PIC machines. Nazary specifically argues that because the prosecutor did not attempt to qualify Stegall as an expert and the court did not expressly designate him as one (see *People v. Jablonski* (2006) 37 Cal.4th 774, 823 [38 Cal.Rptr.3d 98, 126 P.3d 938]), the People may not now justify his testimony and the court's rulings on the ground Stegall testified as an expert. We disagree.

The record here does not reflect any objection to Stegall being qualified or testifying as an expert. Although the trial court did not make an express ruling that Stegall was testifying as an expert, it was not called upon to do so. Because the record clearly shows the prosecutor elicited testimony of Stegall's special knowledge, skill, experience, training and education with regard to the electrical and mechanical workings of the PIC machines and their maintenance without any objection, Nazary cannot now complain that Stegall was not properly qualified as an expert to testify regarding the testing of the PIC machines done by his technicians whose work he reviewed to form his opinion that the minor problems uncovered during those tests on the station's PIC machines would not have accounted for the cash loss in this case. (See Evid. Code, § 353; *People v. Fauber* (1992) 2 Cal.4th 792, 831 [9 Cal.Rptr.2d 24, 831 P.2d 249] [claim forfeited as not being raised as ground against admissibility in trial court].)

██ California law permits a person qualified in a particular field to give expert opinion testimony if the subject matter of the testimony is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact (Evid. Code, §§ 720, 801, 802; *People v. Harvey* (1991) 233 Cal.App.3d 1206, 1226–1227 [285 Cal.Rptr. 158]), and permits the qualified expert in doing so to "rely upon and testify to the sources on which they base their opinions [citations], including hearsay of a type reasonably relied upon by professionals in the field. [Citations.]" (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746–747 [56 Cal.Rptr.3d 6].)

By the time Stegall had answered the questions to which Nazary finally objected, there was sufficient evidence of Stegall's personal knowledge of and intimate familiarity with the particular field of PIC machines and the type of testing that he was overseeing for the maintenance of those machines to provide a foundation for his responses based on his expertise in the field and his reliance on the materials he had reviewed, which included his technician's reports and his discussions with them. The reports prepared by his technicians, which showed the results of their general diagnostic testing of the

entire main board on each of the eight PIC machines at the station, was not offered for the truth of the facts stated but merely as the basis for Stegall's expert opinion that none of the problems uncovered during that testing would have accounted for the cash loss. This is precisely the type of hearsay information that an expert in Stegall's field could properly rely upon to determine whether the PIC system had an internal problem which might explain any shortages. Because this testimony regarding the basis of Stegall's expert opinion was properly admitted, the trial court did not abuse its discretion in denying Nazary's motions to strike it on foundational and hearsay grounds. No evidentiary error is shown in this regard.

## C. *PIC Receipts*

During Casarez's testimony, when the prosecutor identified exhibit 17, a PIC receipt for the October 11, 2006 canister pull, Nazary's counsel objected to it as "[h]earsay as far as the time." The court overruled the objection, which it treated as a motion to strike as to hearsay. Later, when the prosecutor showed Casarez a modified PIC receipt and deposit slip, which was identified as exhibit 28, showing pull errors on October 13, 2006, and asked to enter it into evidence, Nazary's counsel objected "to the question which is the PIC receipt is hearsay." Again, the court overruled the objection as to hearsay.

Similarly, when the prosecutor sought to enter into evidence exhibit 29, which was identified by Casarez as his own writings regarding his precount for October 13, 2006, and a copy of the PIC receipt for that day, Nazary's counsel objected "to the portion . . . which is the PIC receipt, particularly the portions which govern current, actual, business date, and canister pull error as hearsay." The court overruled the objection and admitted exhibit 29 into evidence.

Subsequently, Casarez testified about exhibit 30, which he identified as his writing of the figures the assistant manager told him over the telephone during the second successful precount of the money in the canisters from the PIC machines, about exhibit 31, which he identified as the assistant manager's writing of the amount of cash in the canisters during that precount, and about exhibit 32, which he identified as a copy of the October 16 PIC receipt and deposit slip that had been created for that count by Nazary. The court overruled Nazary's counsel's objection "to the one which is prepared by somebody other than [Casarez], which [he thought was] No. 31." Casarez was then questioned without objection on exhibit 34, which was the October 6, 2006 PIC receipt and deposit slip, and explained about comparing its figures with those on other dates during the precount.

When the court took its noon recess, Nazary's counsel asked the court whether he could have a continuing objection to the PIC receipts as hearsay

"because [he did not] think there's been testimony from the proper witness about how these PIC receipts are generated and whether or not they are generated with accuracy." Counsel wanted a continuing objection "rather than having to do it every time we get to these things." The court was uncomfortable in doing so because it did not think that a continuing objection made a clear record. The court explained that its initial thought in overruling the hearsay objections regarding exhibits 30 through 33 was that it understood those PIC receipts were not being offered to necessarily prove the truth of the information contained within them as it related to the PIC machine totals. It also noted that even assuming they were being offered for the truth of the matter, it was comfortable with the written notations on those exhibits assuming the defense objection was only going to the "actual machine-generated aspect of [the PIC receipts.]"

Defense counsel clarified that that was exactly the objection because there had been no testimony yet that "these PIC receipts are prepared in such a way as to be accurate. So when they're being introduced and given to the jury as here is how much money, according to the PIC, was in a canister, they're accepting that as, well the PIC machine says there should be that much money there. But there's no exception to the hearsay rule that's been established to say that they can accept that. [¶] And that's why I was making that objection."

In response, the court explained that it had overruled the objections because it understood that at some later point the reliability of the actual PIC receipts would be dealt with through the testimony of Stegall and that Casarez had testified to those portions that he and other people he had observed counted and recorded on the PIC receipts in exhibits 30 through 33. Nazary's counsel agreed that the parts that Casarez said he counted were perfectly admissible, but that the machine-printed part was not without Stegall or some other witness laying the foundation for its admission "because we have no idea if these PIC receipts are generated in such a way as to be at all accurate." Understanding the defense position, the court asked the prosecutor to make a record of his position on the matter.

The prosecutor believed the court was viewing the issue exactly the way he was trying to present it, that the PIC receipts were not being admitted for their truth at that point, but rather for the nonhearsay purpose of showing "what did K.A. understand the problem to be, how did they determine what the problem was, and what evidence did they generate to support their belief of what this problem was." The prosecutor intended to bring in Stegall to talk about "how these PIC machines work and how they're accurate to within a few dollars, depending upon the occasional crumpled up bill, then I will argue to the jury that K.A. was right because we know now from an

independent source that these machines were right. Thus, the defendant must have been stealing. [¶] But . . . Casarez's and K.A.'s conclusion of that isn't the final evidence of it. But it's their investigation. It's their belief based on what they're looking at."

The prosecutor additionally noted that the PIC receipts appeared to be "at least accurate in the sense that this is what the machine spits out. [¶] So these aren't manufactured. . . . This is what comes out of those machines or what can be produced at the cash register. [¶] So for purposes of [Casarez's] investigation and what we're showing to the jury his investigation and K.A.'s investigation is, they're relying on that. Certainly, [defense counsel] can cross-examine and argue that they shouldn't rely on it because they're not reliable. But they're not the evidence of the shortage, at least not yet."

When the court agreed there was some indicia of reliability for the PIC receipts, but that the foundation for their admission for their truth was not yet completely laid, the prosecutor suggested that the PIC receipts were a business record generated in the normal course of business. When the court expressed its uncertainty that Casarez could qualify as the custodian of those records or receipts, defense counsel concurred, pointing out that Casarez had testified he did not have the slightest idea what certain printed abbreviations on the PIC receipt meant and thus was not qualified to testify as to its mode of preparation.

At that point, the court ruled it was continuing to consider the PIC receipts as being offered not for the truth of the matters contained within them and was therefore overruling Nazary's counsel's hearsay objection with regard to exhibits 30 through 33, and admitting them at that time. The court noted, however, that at the conclusion of the case it would consider "a limiting instruction as it relates to the actual numbers on the PIC machine [receipts] being admitted for the truth that that's what this particular canister contained because at least at this point, there is not that indicia of reliability in the actual process itself." The court further commented that the PIC canister amounts might become irrelevant in light of the accounting evidence that was yet to be presented by the prosecution, which the prosecutor had represented would show the total amounts lost other than just the two or three days that were on the PIC receipts in evidence at that time.

When Stegall subsequently testified, he explained the hardware mechanics of how a receipt was printed by the PIC machines at the time of a canister pull, explained what the various printed abbreviations and terms meant on the PIC receipt, and explained about the slight overage or shortage that could occur on the PIC receipt if a canister failed to register as pulled and the PIC machine continued to accumulate cash totals until the next pull when it did

register. On cross-examination, Stegall conceded he had not specifically checked the PIC receipts in this case for printed problems, but explained he did not do so because no problem with the mechanical printing of the PIC receipts had been reported by K.A.

At the conclusion of all evidence in the case, when the court asked Nazary's counsel if he objected to the admission of any of the exhibits that had not yet been entered into evidence, which included exhibits 17, 33 and 34, counsel objected to certain photographic exhibits (1–15) and stated he was not objecting to the remaining exhibits "other than my previous objections, which were overruled." The court overruled counsel's specific objections and received the remaining exhibits into evidence.[5] The record does not reflect that either counsel requested any limiting instructions with regard to any of the exhibits showing the printed numbers on the PIC receipts.

On appeal, Nazary complains that the trial court erred when it overruled his hearsay objections to exhibits 17, 28, 29, 32, 33 and 34 because the machine-generated information contained on the receipts was offered for its truth to establish that he had stolen money from the PIC machines at the station. We find no prejudicial error.

Aside from the facts that Nazary did not specifically object to the admission of exhibit 34 and only objected to the "time" printed on exhibit 17, he did not press the trial court to revisit his hearsay objections to the admission of the various PIC receipt exhibits after the court had originally ruled they were admissible during Casarez's testimony for the nonhearsay purpose of showing K.A.'s ongoing investigation into the shortages in the cash from the PIC machines at the ARCO station and the court had denied his request to have a continuing objection to the exhibits. Thus, the trial court was not asked to rule on whether the subject exhibits could properly be admitted for the truth of their machine-generated printed information under the business records exception to the hearsay rule after Stegall's testimony or asked to exclude or limit the jury's consideration of the machine-generated portions of the PIC receipts that had already been admitted into evidence. Under these circumstances, we find that Nazary has not shown an abuse of discretion in the court's earlier ruling admitting the objected-to exhibits for the nonhearsay purpose of showing K.A.'s investigation into the thefts at the station, and has technically waived the right to complain on appeal that the printed portion of the PIC receipts were admitted for their truth.

---

[5] Although the reporter's transcript does not show that exhibits 17, 33 and 34 were specifically received into evidence, the exhibits themselves reflect they were entered into evidence.

Moreover, even if we consider Nazary's counsel's statement at the close of trial renewing his earlier hearsay objections as preserving the issue, we conclude the trial court properly overruled them and admitted the printed portion of the exhibits.

■ As the People point out in their respondent's brief, this case is similar to the situation in *People v. Hawkins* (2002) 98 Cal.App.4th 1428 [121 Cal.Rptr.2d 627] (*Hawkins*), where a hearsay objection was made to a computer printout showing the time certain computer files were last accessed. (*Id.* at p. 1446.) After considering various cases that held computer printouts admissible if they fit within the hearsay exceptions of business or official records and noting those cases did not draw a distinction between printouts that reflected information entered by human operators and those which reflected information the computer generated on its own, the court in *Hawkins* found that this second category of printout the computer generated on its own is not hearsay. (*Id.* at p. 1449.) In doing so, the court cited Evidence Code section 1200, subdivision (a), which defines "hearsay evidence" as "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated"; Evidence Code section 225, which defines "statement" as "(a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression"; and Evidence Code section 175, which defines "person" to include "a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity." (*Hawkins, supra,* at p. 1449.) From its review of these sections, the court in *Hawkins* concluded that, "[t]he Evidence Code does not contemplate that a machine can make a statement." (*Ibid.*)

The court in *Hawkins* went on to note that the evidentiary issues concerning this machine-generated evidence are foundational, and that the test of admissibility is whether the machine was operating properly at the time of the reading, and that the mechanical recordings of information are subject to impeachment through evidence of machine imperfections or by cross-examination of the expert who explained or interpreted the information in the device. (*Hawkins, supra,* 98 Cal.App.4th at pp. 1449–1450.)

■ We agree with the analysis in *Hawkins*. The printed portions of the PIC receipts, including the date, time, and totals, were not statements inputted by a person, but were generated by the PIC machine. "The essence of the hearsay rule is a requirement that testimonial assertions shall be subjected to the test of cross-examination. [Citation.] The basic theory is that the many possible deficiencies, suppressions, sources of error and untrustworthiness,

which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination. [Citation.]" (*Buchanan v. Nye* (1954) 128 Cal.App.2d 582, 585 [275 P.2d 767]; see *People v. Fields* (1998) 61 Cal.App.4th 1063, 1068 [72 Cal.Rptr.2d 255].) Under no possible scenario could the PIC machines have been cross-examined. Rather the witnesses who explained the data printed on the PIC receipts, Casarez, Stegall and Jones, could have been, and were. The imperfections and malfunctions of the PIC machines were the subject of considerable testimony, including that the PIC receipts showed the machines occasionally miscounted the cash in the PIC machine canisters or showed that certain canisters had not been pulled, when in fact, they had been pulled. All of this testimony was presented to the jury for its consideration in determining the reliability of those receipts and the weight to be given them. That is all that was required.

 In his reply brief, Nazary argues that even if this court follows *Hawkins, supra*, 98 Cal.App.4th 1428, the trial court erred in overruling his objections to the admission of the PIC receipts because the prosecutor had not satisfied the foundational requirement of showing that the PIC machine was operating properly at the time of the various printouts to enable it to assert the accuracy or reliability of the printed information on the receipts. However, as Nazary concedes, such issue was not raised at trial. Further, as our Supreme Court noted in *People v. Martinez* (2000) 22 Cal.4th 106 [91 Cal.Rptr.2d 687, 990 P.2d 563], courts in California "have refused to require, as a prerequisite to admission of computer records, testimony on the 'acceptability, accuracy, maintenance, and reliability of . . . computer hardware and software.' [Citation.] . . . [A]lthough mistakes can occur, ' "such matters may be developed on cross-examination and should not affect the admissibility of the [receipt] itself." [Citation.]' [Citations.]" (*Id.* at p. 132.) Here, the accuracy, reliability and maintenance of the PIC machines and the receipts they printed were fully explored and challenged on cross-examination. No error is shown.

### D. *Cumulative Error*

Finally, Nazary contends that even if the multiple evidentiary errors in this case were not sufficient in and of themselves to require reversal, the cumulative effect of such errors requires reversal of the judgment as violative of his due process and fair trial rights. We disagree. Because we have found no prejudicial error in any of Nazary's claimed instances of evidentiary error, he cannot show cumulative prejudicial error (*People v. Beeler* (1995) 9 Cal.4th 953, 994 [39 Cal.Rptr.2d 607, 891 P.2d 153]), or that he was denied due process or a fair trial in this regard (see *People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349 [234 Cal.Rptr. 442]).

## DISPOSITION

The judgment is affirmed.

Nares, J., and Irion, J., concurred.

Appellant's petition for review by the Supreme Court was denied April 13, 2011, S190582.