Filed 10/19/17

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>DOMINGO RODRIGUEZ III,<br><br>  Defendant and Appellant. | F070900<br><br>(Kern Super. Ct. No. BF146893A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Cory J. Woodward, Judge.

Jonathan D. Roberts, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and Gregory B. Wagner, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant Domingo Rodriguez III was released from custody with an ankle monitor pursuant to the Kern County Sheriff's Department's Electronic Monitoring Program (EMP), subject to several terms and conditions, including that he could not

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II of the Discussion.

leave Kern County without permission. The ankle monitor transmitted signals to the EMP's computer tracking system via a Global Positioning Device (GPS).

The GPS signals showed that defendant repeatedly left Kern County and went to other counties and states without asking for or receiving permission from his supervising deputy or any deputy in the department's EMP office. When a deputy reached defendant by telephone, defendant said he was a long-haul truck driver, he drove to other areas as part of his job, and he falsely claimed he had received permission to leave Kern County from an unnamed deputy.

The EMP office issued an arrest warrant for defendant for violating the terms of his release by leaving Kern County without permission. After a jury trial, he was convicted of violating Penal Code section 4532, subdivision (b)(1) – that he willfully and unlawfully, while being a prisoner convicted of a felony, escaped from the EMP on or about December 28, 2012. He was sentenced to eight months for this conviction as part of an aggregate term of nine years eight months based on unrelated convictions in other cases.

In the published portion of this opinion, we find the court properly admitted a report about the GPS signals sent by the ankle monitor that showed defendant left Kern County at certain dates and times.[1] We affirm.

## FACTS

On December 12, 2012, defendant was in custody in county jail. Defendant was a prisoner who had been previously convicted of a felony.

Late that evening, defendant was released on the EMP under the supervision of the Kern County Sheriff's Department. Deputy Bryceton Patterson was assigned to the department's EMP office. Patterson advised inmates of the terms of the program upon

---

[1] In the nonpublished portion of this opinion, we will address defendant's argument that the court erroneously admitted evidence that he left Kern County on dates other than those alleged as the charged offense.

2.

their release. Patterson was also responsible for monitoring inmates on EMP, and ensuring they were complying with their curfew periods and the terms of their release.

Deputy Patterson testified he met with defendant and another inmate at the EMP office, adjacent to the Lerdo jail facility, to advise them of the terms of their EMP release. Patterson reviewed defendant's EMP application form and every page of the EMP's "rule book." Defendant initialed each line to indicate that he had been advised of the terms.

In his application for EMP release, defendant wrote that he lived in Bakersfield, that he was self-employed and was the "owner" of Rodriguez Transportation/Colotl Trucking on Union Avenue in Bakersfield. He wrote that he worked five days a week, the distance from home to work was three miles, and the driving time was five minutes. Defendant wrote he drove a Pontiac, a motorcycle, and a 2010 Peterbilt commercial vehicle.

The "rulebook" stated that "[w]hen not at work, approved court appearances, or probation visits I understand that I will be required to stay at home and AGREE TO REMAIN INSIDE MY RESIDENCE. I must request permission in advance of leaving the premises and must bring back documentation verifying my absence …." (Capitalization in original.) "I understand that if I fail to return home within the prescribed time or leave home at an invalid time, I may be considered an escapee and subject to immediate arrest. I may be charged with escape" under the Penal Code. Defendant signed the statement of rules, attesting that he read and understood the conditions, and that any violation could result in criminal charges and/or removal from the program.

Deputy Patterson testified that when inmates are initially released from custody pursuant to EMP, they are placed on "a seven-day blackout period. They are to remain at their house inside for the first seven days unless they have permission to leave from us. After that, the deputy who is in charge of that inmate, it's their determination on how

3.

much time an individual may need outside the house whether they are working a job, maybe just have errands to run, those kind of things. So they will set their own curfews." After the initial blackout period, the inmates' supervising deputy "would discuss with them their needs as far as time away from their house and they will establish a curfew they believe fits what the inmate needs." Once inmates finish the seven-day blackout period and receive their curfew periods, "they will be able to leave within those home retention hours."

Deputy Patterson testified about the most common terms stated in the rulebook:

"[T]hat inmates are to remain at their residence during the [initial] home confinement time, *not be allowed to leave the county or the state without permission from the office*. Inmates are not to consume alcohol or drugs nor associate with any persons on probation or parole, outstanding warrants for their arrest, must be courteous and kind to office staff as well as deputies. Those are the majority of them." (Italics added.)

Patterson testified that he advised defendant about the "terms of confinement."

"[T]hat they cannot leave their house before their [initial] home confinement time starts and after it stops, that time being any permission we've given them to leave. *That permission must be obtained verbally or in person. Messages don't count. In this case the application is stating similar that if they are not home within those times, that we are going to charge them with escape from custody*." (Italics added.)

Deputy Patterson testified that after reviewing the terms, he gave the rulebook to defendant. Patterson also gave defendant his desk and cell phone numbers, and the contact numbers for defendant's supervising deputy.

Deputy Patterson testified he placed an ankle monitor on defendant that had a specific identification number (No. NF0002048). The identification number was used to track the inmate on the EMP office's GPS system.

Deputy Patterson testified the entire release process usually took about 15 to 30 minutes. During that initial advisement meeting, Patterson did not discuss the inmate's work schedule since the inmate was being released pursuant to the seven-day blackout

4.

period.  After that initial period, the supervising deputy would then meet with the inmate, discuss the inmate's work schedule, and set the curfew period.

Deputy Patterson testified the deputies who worked in the EMP office had access to the computer program that contained electronic files for every inmate released on EMP.  An inmate's electronic file contained information from the inmate's application, notes about contacts and messages, curfew hours, and "[a]ll their GPS locations and histories."  If an inmate wanted to leave his house during the initial seven-day blackout period or stay out beyond their curfew, he had to call the supervising deputy or the deputy at the EMP office for permission, and that call would be noted in their electronic file.

Deputy Patterson had been assigned to the EMP program for two years.  He had never personally given permission to any inmate to leave the state.  To the best of his knowledge, he did not believe such permission had been given to any inmate.

## EVIDENTIARY HEARING ABOUT ADMISSIBILITY OF OF GPS EVIDENCE AND REPORT

The primary evidentiary issue in this case was whether the prosecution could introduce evidence about the GPS data transmitted by defendant's electronic ankle monitor, including a printed report that stated defendant's whereabouts and his travels outside of Kern County while he was released pursuant to the EMP.

The People moved to introduce the testimony of Sergeant Kessler and Deputy Veon from the EMP office about how the GPS data showed defendant's location at particular dates and times.  The People argued the report about the GPS data was not hearsay, it was computer-generated evidence, and it was presumed authentic and admissible under Evidence Code[2] section 1552.[3]

---

[2] All further statutory citations are to the Evidence Code unless otherwise indicated.

[3] As we will explain in issue I, *post*, section 1552, subdivision (a) states:  "A printed representation of computer information or a computer program is presumed to be

5.

Defendant moved to exclude all evidence of the GPS data obtained from the computer tracking system for the ankle monitor. Defendant argued the evidence was inadmissible unless the People established the foundation for the authenticity of the data. Defendant further argued the entirety of the GPS evidence was inadmissible hearsay.[4]

*Evidentiary hearing*

The court conducted an evidentiary hearing prior to admitting any evidence about the GPS data. Sergeant David Kessler of the Kern County Sheriff's Department, who was the supervisor of the EMP office, was the only witness called by the People. He had testified in court four or five previous times about ankle monitors and GPS data.

Sergeant Kessler testified the sheriff's department rented the ankle monitors and tracking software from the Alcohol Monitoring System (AMS) company, formerly known as Gryphex. He was trained at a four-hour session with an engineer from Rocky Mountain Offender Systems, who discussed how the ankle monitors and accompanying software worked. Kessler received additional training during his regular interactions with AMS personnel, either by telephone or email, and received updates about the system. Kessler's knowledge about the system was based on the training class, his

---

an accurate representation of the computer information or computer program that it purports to represent. This presumption is a presumption affecting the burden of producing evidence. If a party to an action introduces evidence that a printed representation of computer information or computer program is inaccurate or unreliable, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the computer information or computer program that it purports to represent."

[4] As we will explain in issue II, *post*, defendant also moved to exclude any evidence that he was not at his residence on dates other than December 28, 2012, as charged in the information, and argued evidence of other incidents constituted irrelevant and inadmissible propensity evidence. The court overruled this motion.

communications with AMS personnel, and his experience working with GPS data in his EMP assignment.[5]

Sergeant Kessler testified that the GPS was "actually just a receiver and then the transmitting to the software is done through a cellular card or air card, and that is built into the unit. It is exactly like a cell phone but in a different case without all the fancy features." However, the inmate's location is not determined by his proximity to a cell phone tower:

> "GPS is done by satellites. There [are] over 30 satellites orbiting the Earth that are run by the government. It delivers a time and place, space to the device, and that, depending on how many satellites are tracking it, will calculate how far and what position it is on Earth."

The ankle monitor "takes a GPS point" every three minutes, and transmits the inmate's location through a GPS signal every 15 minutes. "Every three minutes … the device stores the information of where the offender is located, and then every 15 minutes of the day it is uploaded into the servers unless you request a location from it, then it calls up the device at that time." Since the device calculates a new GPS point every three minutes, there are five GPS locations obtained within 15 minutes. If the device does not have a cell connection, it will store that information up to 50,000 location points, and then transmit that information when the connection is restored. If the deputy requests the inmate's location, the GPS system can "call[] up the device at that time."

Sergeant Kessler testified that errors usually occur when the inmate is inside a building where the GPS signal is not as accurate. Such errors are usually limited to a few hundred feet. In order to avoid the inaccuracies inside an inmate's house, the deputies "put up a zone or a geo-fence around that house" of approximately 300 feet, to avoid a false alarm that the inmate violated curfew.

---

[5] In issue I, *post*, we will address defendant's contentions about whether Sergeant Kessler's testimony was insufficient to authenticate the report about the GPS data.

7.

"When you see someone moving on a GPS, you will see them plot along a certain route. Usually these errors or what we call them drift, you will see a point that is out of the ordinary, so it won't be along the road. Sometimes they pop up into weird places. But usually it is within, I would say, an eighth of a mile around the actual location of where it is. And it is caused because it is inside of a residence. *When it is out in the open, GPS is actually very accurate.*" (Italics added.)

Sergeant Kessler testified he had never experienced a situation where the GPS data indicated an inmate was in California, when the inmate was actually in Texas.

Sergeant Kessler testified the sheriff's department used computer software called Insight to access the GPS information transmitted from each inmate's ankle monitor. "The device calls the server, downloads the information to the server; the information is then … stored within the software. When you call up the location history, it takes the GPS points and plots them into addresses through using Google Maps and displays that information onto the screen." The deputies were able to "pull up reports" on each inmate from the software.

Sergeant Kessler testified about the GPS report prepared from defendant's ankle monitor, which the People sought to introduce at trial. Kessler testified it was similar to other reports produced about inmates released on ankle monitors. Kessler testified the deputies could obtain reports about the inmate's activities directly from the software on the computer system. However, sometimes the reports are archived to save space in the server, and the officers then request the reports from AMS. "Unfortunately, just due to the size and not overloading the system, sometimes they are archived reports to save the space for the active participants."

Sergeant Kessler testified that defendant's GPS report had been "produced by the company [referring to AMS]. If it is a report that we are producing, it pulls the offender I.D. by the GPS number or name. You could pull it by several different factors, and then it provides us with GPS locations, addresses, and times and dates."

Sergeant Kessler explained that a deputy is able to track a particular inmate using his name and the ankle monitor's serial number, which is unique to each inmate. The

8.

software "comes up with just the location, the date and time, and it also plots it onto a Google Map for us." The deputies can track the inmate's movements by watching the computer screen, which shows the inmate's monitor number.

> "[T]he information doesn't … go up to the satellite. Nothing goes to the satellite. The satellite gives dates and times, and its position within space and broadcasts the signals constantly down to Earth. So pretty much a giant clock in the sky. [¶] Depending on how many satellites are hitting the device receiver, it will calculate the distance between each satellite to find out which longitude and latitude it is on Earth, and that's the point on Earth where it is located. [¶] What happens then is every 15 minutes it puts all those GPS points and transmit it up into the servers. By placing those GPS coordinates into a mapping software, Google, Safari, whichever mapping software you want, those will give you an approximate address of where the device is located; similar to the GPS devices in your car and everything else, it could track along those points."

Sergeant Kessler testified that all the GPS points "are stored in the [Insight] software" and "put into a user-friendly format to where the officers can read it." "[The ankle monitor] device calls the server, downloads the information to the server; the information is then … stored within the software. When you call up the location history, it takes the GPS points and plots them into addresses through using Google Maps and displays that information onto the screen."

Sergeant Kessler believed the main servers for AMS are located at the company's headquarters in Atlanta, Georgia. Once the information is in the servers, a deputy can access the information on the Internet using the assigned password for the secured site "just like any normal web-based software or account that is out there." The information can be printed out in different ways, "[d]epending on what kind of information you are looking for," including in map form.

> "Q.    So basically what happens is a deputy puts in a password into a web site to get somebody's information to get their location; is that correct?

> "A.    Well, it is a web-based program that's used through secured encryption software that transmits back and forth that a deputy puts their

9.

information in, the user I.D. along with the password [in] order to access the data we allow them to access.

> "Q. *So what the deputy is looking at after they typed in their password and identification, things like that, what they are looking at is simply information that's given to them by this server, correct?*
>
> "A. *Well, it is not given. We put in information into the system. We change information that it put into the system. We adjust schedules. We do a lot of interacting with the system. It is just not the system feeding us the information. We actually have to put in the information in order for it to connect up and work.*
>
> "Q. *Can you change somebody's location?*
>
> "A. *No.*
>
> "Q. Do you know how the information from the servers gets transmitted to the software, the web-based software, like deputies yourself, sergeants like yourself, look at with regard to the ankle monitors used by the Kern County Sheriff's Department?
>
> "A. It is all one system. The servers run the software and hold the data. It is kind of like your computer at home. It has all the stuff on it. It is just [a] bigger unit, I would say.
>
> "Q. So what the deputies do is basically log on to the software, and they can get – they can obtain information from the server or put information into the program; is that right?
>
> "A. Correct. Similar to remote access to your computer. If you were off site—if you want somebody to access your work computer or home computer, you could do that through that the internet. Those computers are just somewhere else and deputies are accessing them." (Italics added.)

Sergeant Kessler explained that the software consisted of both the inmate's electronic file and the GPS data. "It is like having your Windows computer and having a calendar in it. It is just part of the software. It is all built in." The deputies could correct the inmate's personal information in his electronic computer file, such as his schedule and any notes about the case.

"Q. So what a deputy could change would be, for example, somebody's—an offender's name, right?

"A. Yes. They could change the name. There is a history that goes along with it, too. They could change their schedules. They could add notes to it. They can't delete any notes or anything like that. They could add exceptions to the schedule. So if someone says they are not going to be home at a certain time, they could add an exception to the schedule. That allows them a little more time so we don't get a violation in the system."

However, Sergeant Kessler further explained that the deputies could not tamper with the hardware, the software program, or alter the GPS data.

"Q. Are deputies within the Kern County Sheriff's Department able to fix bugs or problems with the servers are located in Atlanta, Georgia?

"A. If you are talking about the hardware portion of it, no. That's over any deputy's head. That's usually used for experts to fix. If you are asking if there are ways that deputies can fix data that might be wrong in the system, yes. *If it is data related [to] the GPS points, no. The GPS points are, again, sent from the satellites to the device, the device calculates it where it is on Earth and then puts it into the server. We cannot change the points and those are longitude/latitude points that are made.*" (Italics added.)

Sergeant Kessler testified that on hundreds of occasions, he had relied on the GPS data to go to a location to find an inmate, and found both the inmate and the ankle monitor.

Sergeant Kessler was familiar with the GPS report prepared about defendant, and testified he did not see any inaccurate location information.

"[Y]ou see consistent locations of travel on those points. [I]t would be inaccurate if he was saying he was in California and you get one point in Texas and then all of sudden he is back in California three minutes later. We would know that point is inaccurate. You don't have that. You have a consistent trail. And if you type in most of these addresses, you will see that trail along major roadways or highways and stuff like that …."

The defense cross-examined Sergeant Kessler, but did not call any witnesses or introduce any evidence to dispute his hearing testimony.

11.

*The parties' arguments*

The prosecutor argued Sergeant Kessler's testimony established that ankle monitors electronically transmitted the inmate's location to the GPS system, and no one could manipulate or change that information. The prosecutor argued the data was entirely electronic, they could tell when something was wrong based on the travel routes, and it was not hearsay. The prosecutor further argued that she was not required to call a witness from the software company to testify about the accuracy of the server, and defendant's objections on those points went to the weight and not the admissibility of the evidence.

Defense counsel replied that prior cases had found that only electronic photographic data was not hearsay. Counsel discounted Sergeant Kessler's testimony because he was not the custodian of records from the AMS company. Counsel argued that the prosecutor could not introduce the electronic evidence without foundational testimony from the custodian of records for the AMS company about how the information was compiled, and the evidence did not satisfy any hearsay exceptions.

*The court's ruling*

The court overruled defendant's objections, and held the GPS evidence and the printed report were admissible:

> "[T]he information that is being received by the sheriff's department is not hearsay. It is certainly not testimony in any fashion in this Court's view. Consequently, we are not dealing with necessarily establishing the exceptions to the hearsay rule, but the Court is relying upon … section 1552 to allow that information to come forward."

## TRIAL EVIDENCE ABOUT THE GPS DATA

At trial, Sergeant Kessler repeated much of his hearing testimony about the operation of the ankle monitors and the GPS system used by the EMP office, and that it was rented from AMS and used software from Insight.

12.

Sergeant Kessler testified before the jury about how the system worked, and that each ankle monitor contains a cellular card, similar to those in a cell phone. "Every so often it calls up the network and downloads the [location] information that it stores … into the servers and from that it's put into a software where we could interface with it and see the data that's needed." The ankle monitor sends signals for GPS readings every three minutes. The GPS readings are loaded into the network and recorded into the system every 15 minutes. The system can store up to 50,000 location points for each ankle monitor. The software program contains the list of inmates and their assigned monitors, and different color dots "will tell us if that device is working properly or not, location, the equipment and also … if they are within their area."

Sergeant Kessler testified that mapping software was used to create an electronic zone for each inmate. The inmate's ankle monitor and GPS data recognize that zone. The sheriff's department receives an alert if the inmate goes beyond that zone.

Sergeant Kessler testified the deputies are able to download data from the computer program about the inmate's locations and movements. The AMS company holds the older data that has been archived, and it is provided upon request.

Sergeant Kessler testified that if the inmate and the ankle monitor are moving outside a building, the GPS data is "very accurate." When the inmate is moving outside or traveling on a street, "you will see where the points all line up and actually connect that path along the road and stuff there's an interface with Google Maps that allows it to plot it along the highways, roadways so you could actually see where they are." A deputy on patrol can access to the computer program to track the inmate's location.

> "[F]rom the GPS unit, it's cell service to the servers, from the servers it's translated latitude and longitude to the addresses through Google Map software and you are able to print out the information in different forms. If it's archived, the company will send us the data that we request either electronically or in the mail."

13.

If the inmate walks into a house or building, the GPS data would show the point of entry, but the information is not as accurate inside the structure itself.

Sergeant Kessler testified that a GPS signal is not transmitted if the ankle monitor's battery expires. The ankle monitor will vibrate if the battery starts to fail and needs to be charged. The inmates are instructed to charge the ankle monitor every 12 hours. Once the battery expires, the EMP office cannot track the inmate and the electronic file is no longer updated.

Sergeant Kessler testified that if an inmate leaves the state, the GPS computer program will receive a notification with a red dot, and the supervising deputy will receive a text message. Kessler had never seen an ankle monitor erroneously report that an inmate was in Texas when he was actually in California.

Sergeant Kessler testified that a "Generation 3" ankle monitor was placed on defendant when he was released on EMP. There were no problems with those devices aside from having to charge the battery. The device would indicate if the charger was working. The inmates are instructed to notify their supervising deputy if they have problems with the ankle monitor or the charger.

## TRIAL EVIDENCE ABOUT DEFENDANT'S LOCATION

*Defendant's supervising deputy*

Deputy Jared Wilson was assigned to supervise defendant on electronic monitoring. Wilson testified that every deputy in the EMP office had access to the inmates' electronic case files, and could enter case notes on their records. The case notes were stored within the computer system, and the deputies could print out the notes.

Deputy Wilson testified that after an inmate completed the seven-day blackout period, he was assigned a curfew period that was usually between 8:00 p.m. to 8:00 a.m. unless there were work considerations. An inmate on EMP could break curfew only after receiving permission from a deputy at the EMP office. Such a request would be noted in the inmate's electronic file.

14.

An inmate could not leave Kern County without receiving permission from a deputy at the EMP office. Deputy Wilson testified, "We didn't allow anybody to leave the state."

Deputy Wilson testified that if defendant had advised him that he worked as a long-haul truck driver, Wilson would have told defendant that he could not leave the county. Wilson explained that "[a]ll of the subjects that are on the [EMP] are in custody with our county and are actually serving felony sentences so we don't allow them to go out of county of [*sic*] the chance they may escape or not return." Wilson testified that even if a deputy gave an inmate permission to leave the state, that deputy would have entered that information in defendant's electronic file.

Deputy Wilson testified defendant never called him or asked him for permission to leave Kern County between December 12, 2012, and January 31, 2013.

### *Defendant's initial contacts with the EMP office*

Deputy Wilson testified he reviewed the notes in defendant's electronic file, and that on December 17, 2012, five days after he was released, defendant called the EMP office and spoke to the clerk. Defendant requested permission to leave his house and attend a gatekeeper meeting, and said he would be home at a certain time.[6]

On December 26, 2012, defendant called the EMP office, spoke to Senior Deputy Nelson, and requested permission to go to Shafter; Lieutenant Pluggae granted permission.

### *Defendant speaks with the EMP Office*

Deputy James Veon testified that on December 28, 2012, he was working in the EMP office. He noticed on the computer screen that defendant committed a zone violation. The GPS data showed that defendant was in Monrovia in Southern California,

---

[6] The electronic file notes were introduced as Exhibit No. 2, and consist of a single page separate and apart from the GPS report. These notes have columns for date/time of entry, the event, the deputy's name, and the action taken.

15.

and he was traveling north towards Bakersfield. Veon reviewed defendant's GPS history and discovered he had been in Arizona two days earlier. Veon checked defendant's file and did not find any information that he had permission to leave Kern County.

Deputy Veon testified he called Deputy Wilson, and asked whether defendant had permission to leave Kern County. Wilson testified defendant never called him prior to leaving Kern County, and he never gave permission for him to go to Monrovia.

Deputy Veon testified he called defendant's cell phone. Defendant answered, and Veon asked why he was outside Kern County. Defendant said he was a long-haul truck driver and part of his job was to leave the county. Veon asked defendant if he had received permission to leave. Defendant said he got permission from a deputy, but he did not give the deputy's name or phone number. Veon told defendant to call Deputy Wilson and gave his contact information. Veon entered notes about this exchange in defendant's electronic file.

Deputy Wilson testified defendant never called him about being in Monrovia after being ordered to do so by Deputy Veon.[7]

### *Issuance of arrest warrant*

Deputy Veon testified that on January 21, 2013, he was on duty at the EMP office and checked defendant's records. According to defendant's GPS information, he had been in McGregor, Texas, three days earlier. Veon testified there were no further signals from the ankle monitor. The computer program indicated the battery had not been recharged and it was dead. Veon called defendant's cell phone, but defendant did not answer and it did not switch to voicemail.

---

[7] The information in this case charged defendant with committing the escape based on the December 28, 2012, incident, when the GPS data reflected that defendant was in Monrovia in Southern California, and defendant admitted during the cell phone call that he was not in Kern County.

16.

Deputy Veon testified he advised Deputy Wilson about defendant's location and the status of his ankle monitor. Wilson said that he did not give permission for defendant to leave Kern County.

Deputy Veon testified that when the battery in an inmate's ankle monitor fails, he tries to contact the inmate by telephone or in person to resolve the matter. Veon again tried to call defendant, and defendant did not answer. Veon went to defendant's residence in Bakersfield and no one was there.

Deputy Veon testified that on January 24, 2013, an arrest warrant was issued for defendant because of his violation of the EMP release.

**The GPS report**

Sergeant Kessler also testified about defendant's whereabouts for the entirety of his time on EMP, based on the printed GPS report compiled from the data transmitted from his ankle monitor, and which the court had admitted into evidence over defendant's objections.[8]

Kessler testified that on the afternoon of December 21, 2012, defendant had traveled on a highway through Pixley and Tulare, outside of Kern County. On December 22, 2012, he was back at his house in Bakersfield.[9]

---

[8] The court admitted the entirety of the GPS report into evidence. It consists of approximately an inch of documents in a three-ring binder. Each page has approximately 50 single-space entries with columns for defendant's name, identification number, the time and date, and his specific location at that time, for the period of December 12, 2012, to January 18, 2013. The locations were specified as either street addresses (e.g., "1158 Bunker Road, McGregor, TX 76657, USA") or highways ("Blue Star Memorial Highway, Needles, CA, 92363, USA"). The GPS report is entirely separate from the single-page of case notes that the deputies entered into defendant's electronic file.

[9] In the nonpublished portion of this opinion, we will address defendant's argument that the court erroneously permitted the prosecution to introduce evidence that he left the county and the state on occasions other than the charged offense on December 28, 2012.

On December 27, 2012, defendant was in the area of Phoenix, Arizona. On December 28, 2012, he was in Brawley and Sylmar. On December 29 and 30, 2012, he was in Visalia, Hanford, Tulare, Tipton, McFarland, and Bakersfield. On December 31, 2012, he was at his house in Bakersfield; later that day, he was in Castaic, just south of Kern County.

On January 2, 2013, defendant was back at his Bakersfield home. On January 3 and 4, 2013, defendant left Bakersfield, and went to Barstow, the Tehachapi area, and several cities in Arizona.

Deputy Wilson testified that according to the separate notes in defendant's electronic file, Deputy Blanks reported on January 4, 2013, the GPS data reflected that defendant was in Mojave. Blanks called defendant's cell phone, but there was no answer.

Sergeant Kessler testified that according to defendant's GPS report, defendant traveled from Bakersfield, to Tehachapi (Kern County) and Needles (San Bernadino County) in California, and several cities in Arizona, New Mexico, and Texas, on January 17 and 18, 2013. The last GPS signal was from McGregor, Texas, and there were no further GPS signals after January 18, 2013.

Sergeant Kessler testified to his opinion that the GPS reports were accurate because the GPS data showed defendant's travel routes were loops from Bakersfield to Arizona or Texas, and then back to Bakersfield.

Deputy Wilson testified defendant never called him to request permission to leave Kern County on these occasions. If an inmate had called another deputy in the EMP office and requested permission to leave the county and/or the state, that would have been important enough for the deputy to make a note in the electronic record.

*Defendant calls the EMP office*

Senior Deputy Josh Brooks testified he was working at the EMP office on February 11, 2013, and received a telephone call from defendant. Defendant said he left his charging device at home. Brooks asked defendant where he was. Defendant said he

18.

was a truck driver, he was in Utah, and he would return the following day, around 2:30 a.m. or 3:00 a.m. Brooks directed defendant to return immediately. Brooks asked defendant for whom he worked. Defendant said he worked for Lanic Transportation and gave a telephone number.

After he talked to defendant, Deputy Brooks discovered there was an outstanding arrest warrant for him in this case. He did not call defendant back and advise him about the warrant.[10]

The parties stipulated that when defendant was arrested and taken into custody, ankle monitor No. NF0002048 was secured to his ankle.

**Conviction and sentence**

After a jury trial, defendant was convicted as charged of violating Penal Code section 4532, subdivision (b)(1), that he willfully and unlawfully, while being a prisoner convicted of a felony, escaped from the EMP on or about December 28, 2012, based on the Monrovia incident.

Defendant was sentenced to an aggregate term of nine years eight months on a series of cases. Within that aggregate term, he was sentenced to eight months (one-third the midterm) for his escape conviction in this case.

## DISCUSSION

### I. *Admission of GPS Evidence*

Defendant contends the court erroneously admitted the report on the GPS data, and permitted the deputies to rely on that report to testify about defendant's whereabouts and that he violated the terms of the EMP by leaving Kern County and California.

Defendant argues the report about the GPS data transmitted by the ankle monitor was not properly authenticated, the court improperly relied on section 1552 to admit the

---

[10] On cross-examination, Deputy Wilson acknowledged that Deputy Brooks failed to make any notes about the February 11, 2013, conversation in defendant's electronic file.

19.

evidence, and Sergeant Kessler's testimony at the evidentiary hearing was insufficient to establish the foundation for the report. Defendant asserts that Sergeant Kessler did not know anything about the underlying software and could not authenticate the hundreds of location points in the GPS report since it was generated by software produced by the AMS company and not by the sheriff's department. Defendant contends the court should have excluded the GPS report at the evidentiary hearing because the People failed to call an expert from the company that created the tracking software and managed the servers to authenticate the evidence.

Defendant further argues that the GPS report was hearsay and was not admissible as either an official record or a business record. Defendant acknowledges a series of cases have found computer generated photographs are not hearsay, but asserts that photographic evidence is different from GPS data because it is automatically generated without human manipulation. Defendant asserts the GPS data in this case was subject to manipulation because the deputies could enter notes and modify defendant's electronic records.

Defendant raises another hearsay issue based on the serial number on the ankle monitor, and argues that the GPS data was linked to that serial number but the testimony about that identification was hearsay.

Finally, defendant asserts the GPS report constituted inadmissible "testimonial hearsay" because it was solely produced to prosecute him for the escape charge in this case.

We review the trial court's evidentiary rulings on authentication, foundation, and hearsay for an abuse of discretion. (*People v. Goldsmith* (2014) 59 Cal.4th 258, 266 (*Goldsmith*); *People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Smith* (2009) 179 Cal.App.4th 986, 1001.) We will not disturb the court's ruling " 'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd

20.

manner that resulted in a manifest miscarriage of justice.' [Citation.]" (*Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

### A. Authentication

We begin with defendant's argument that Sergeant Kessler's testimony at the evidentiary hearing was insufficient to authenticate the computer records of defendant's GPS data. Defendant asserts the GPS data could not have been authenticated unless the People introduced the testimony of a custodian who worked for AMS or the appropriate company that produced the software, operated the servers and hardware, and could have explained how the ankle monitor generated the GPS data and the computer report was produced.

"Authentication of a writing … is required before it may be admitted in evidence. [Citations.] Authentication is to be determined by the trial court as a preliminary fact [citation] and is statutorily defined as 'the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is' or 'the establishment of such facts by any other means provided by law' [citation]." (*Goldsmith*, *supra*, 59 Cal.4th at p. 266.)

"The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered. [Citation.] Essentially, what is necessary is a prima facie case. 'As long as the evidence would support a finding of authenticity, the writing is admissible. The fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' [Citation.]" (*Goldsmith*, *supra*, 59 Cal.4th at p. 267.)

Section 1552, subdivision (a) states a presumption that printed representations of computer information are accurate representations of such information:

> "A printed representation of computer information or a computer program
> is presumed to be an accurate representation of the computer information or
> computer program that it purports to represent. This presumption is a
> presumption affecting the burden of producing evidence. *If a party to an*

*action introduces evidence that a printed representation of computer information or computer program is inaccurate or unreliable*, the party introducing the printed representation into evidence has the burden of proving, by a preponderance of evidence, that the printed representation is an accurate representation of the existence and content of the computer information or computer program that it purports to represent." (§ 1552, subd. (a), italics added.)[11]

Section 1552's presumption "operates to establish only that a computer's print function has worked properly. The presumption does not operate to establish the accuracy or reliability of the printed information. On that threshold issue, *upon objection* the proponent of the evidence must offer foundational evidence that the computer was operating properly." (*People v. Hawkins* (2002) 98 Cal.App.4th 1428, 1450 (*Hawkins*), italics added.)

However, a series of cases have clarified the type of authentication required for the admission of computer records. "It is settled computer systems that *automatically record* data in real time, especially on government-maintained computers, are presumed to be accurate. Thus, a witness with the *general knowledge* of an automated system may testify to his or her use of the system and that he or she has downloaded the computer information to produce the recording. No elaborate showing of the accuracy of the recorded data is required. Courts in California have not required 'testimony regarding the " 'acceptability, accuracy, maintenance, and reliability of ... computer hardware and software' " in similar situations. [Citations.]' [Citation.] [¶] The rationale is that while mistakes may occur, such matters may be developed on cross-examination and should not affect the admissibility of the printout or recording of the data itself. [Citations.]" (*People v. Dawkins* (2014) 230 Cal.App.4th 991, 1003 (*Dawkins*), italics added; see *Goldsmith*, *supra*, 59 Cal.4th at p. 272; *People v. Martinez* (2000) 22 Cal.4th 106, 132; *People v. Lugashi* (1988) 205 Cal.App.3d 632, 642; *People v. Nazary* (2010) 191

---

[11] Section 1553, subdivision (a) states a similar presumption for a "printed representation of images stored on a video or digital medium."

Cal.App.4th 727, 755 (*Nazary*), overruled on other grounds in *People v. Vidana* (2016) 1 Cal.5th 632, 648.)

### 1. *Analysis*

The court did not abuse its discretion when it relied on Sergeant Kessler's testimony at the pretrial evidentiary hearing to authenticate the GPS data and admit the report. Kessler extensively testified about his familiarity and knowledge of how the ankle monitor transmitted defendant's location through GPS data, the computer software used to track the ankle monitor and the GPS data, and how the GPS report was generated. Kessler also testified about the accuracy and reliability of the GPS report generated from the ankle monitor's signals.[12]

Defendant asserts the court erroneously relied on section 1552 to authenticate the report. While defendant challenged Sergeant Kessler's testimony on cross-examination, he did not introduce any evidence that the computer that produced the GPS data transmitted by the ankle monitor was not working properly, question the reliability of the GPS data produced by the computer, or undermine Kessler's testimony on this point, to shift the burden to the People to establish such a foundation. (*People v. Martinez*, *supra*, 22 Cal.4th at p. 133; cf. *People v. Rekte* (2015) 232 Cal.App.4th 1237, 1246 [defendant undermined presumptions created by sections 1552 and 1553 by introducing expert

---

[12] In *Commonwealth v. Thissell* (Mass. 2010) 457 Mass. 191 [928 N.E.2d 932], the court explained that GPS technology "is widely used and acknowledged as a reliable relator of time and location data." (*Id*. at p. 198, fn. omitted.) "A review of the origins of GPS technology provides further assurance of its reliability. See National Space-Based Positioning, Navigation, and Timing Coordination Office, The Global Positioning System ('U.S.-owned utility that provides users with positioning, navigation, and timing [PNT] services'). The GPS system consists of three segments operated and maintained by the United States Air Force. [Citation.] The space segment is comprised of twenty-four satellites which transmit one-way signals giving the current GPS location and time. The control segment consists of monitor and control stations that command, adjust, track, maintain, and update the satellites. Finally, the user segment includes the GPS receiver equipment that utilizes the transmitted information to calculate a user's position and time. [Citation.]" (*Id*. at p. 198, fn. 15.)

testimony and evidence that computer-generated information and digital images were inaccurate and unreliable, shifting burden to proponent who failed to refute defense expert, such that evidence was not authenticated].)

Defendant argues that Sergeant Kessler's testimony did not provide the requisite foundation and authentication, and that an expert from AMS should have testified as custodian about the operation of the hardware and software that produced the GPS data and the report. A similar argument was rejected in *People v. Lugashi*, *supra*, 205 Cal.App.3d 632, which addressed the foundational evidence required for the business records exception to the hearsay rule in section 1271, for the admission of computer-generated credit card records. Defendant argued that "only a computer expert, who could personally perform the programming, inspect and maintain the software and hardware, and compare competing products, could supply the required testimony. However, a person who generally understands the system's operation and possesses sufficient knowledge and skill to properly use the system and explain the resultant data, even if unable to perform every task from initial design and programming to final printout, is a 'qualified witness' " for authentication purposes. (*Lugashi*, at p. 640; see also *Goldsmith*, *supra*, 59 Cal.4th at p. 272 [police employee's testimony about operation of automated traffic enforcement cameras was sufficient for authentication of automatically-produced digital photographs; testimony from a technician for company that maintained automated traffic cameras, or other person with special expertise, was not required]; *Dawkins*, *supra*, 230 Cal.App.4th at p. 1003 [deputy's testimony sufficient to authenticate computer generated audio recording of 911 call].)[13]

---

[13] In *United States v. Espinal-Almeida* (1st Cir. 2012) 699 F.3d 588 (*Espinal-Almeida*), the court similarly held that expert testimony was not required to authenticate a computer-generated report of GPS data: "The issues surrounding the processes employed by the GPS and software, and their accuracy, were not so scientifically or technologically grounded that expert testimony was required to authenticate the evidence, and thus the testimony of … someone knowledgeable, trained, and experienced in analyzing GPS devices, was sufficient to authenticate the GPS data and software generated evidence.

Defendant argues Sergeant Kessler's testimony about the GPS system was insufficient for authentication because he admitted that the report about defendant's GPS data was not produced by the sheriff's department, but instead it was requested from and obtained from the company. Kessler testified that the GPS points are "sent from the satellites to the device, the device calculates it where it is on Earth and then puts it into the server. We cannot change the points and those are longitude/latitude points that are made." Kessler testified that the officers could obtain reports about the inmate's activities directly from the system, but explained that "just due to the size and not overloading the system, sometimes they are archived reports to save the space for the active participants." While the report prepared for defendant's GPS data was requested from the company, defendant did not introduce any evidence to undermine Kessler's testimony that the GPS data could not be altered once it was transmitted by the ankle monitor.

We conclude the trial court did not abuse its discretion when it overruled defendant's authenticity objections to the computer-generated GPS report. Sergeant Kessler's hearing testimony was sufficient to authenticate the report, and defendant did not introduce any evidence to undermine the reliability of the evidence and refute section 1552's presumption.

We further note that the reliability of the GPS data was corroborated by defendant's admissions to Deputy Veon on December 28, 2012, that he had left Kern County and claimed he had received permission to do so because of his trucking job; and his admissions to Deputy Brooks on February 11, 2013, when he said he was in Utah.

---

[Citation.]" (*Id.* at pp. 612–613; see also *Gross v. State of Maryland* (2016) 229 Md.App. 24, 35–36 [142 A.3d 692] [agrees with *Espinal-Almeida* that expert testimony not necessary to admit records of GPS data, and officer's testimony sufficient to authenticate records].)

## B.    Hearsay

Defendant next contends that even if the computer report of the GPS data generated from defendant's ankle monitor was properly authenticated, it still constituted hearsay and was inadmissible.

In California, a series of cases previously held that computer records were hearsay, and admissible if the proponent satisfied the requirements for either the official or business records exceptions to the hearsay rule.  (§ 1271; see, e.g., *People v. Lugashi, supra*, 205 Cal.App.3d at pp. 641–642; *Aguimatang v. California State Lottery* (1991) 234 Cal.App.3d 769, 797–799.)

In *Hawkins, supra,* 98 Cal.App.4th 1428, however, the court held that not all information stored or generated by a computer constituted hearsay.  In that case, the defendant was accused of improperly accessing his employer's computer.  The prosecution moved to introduce computer generated printouts that showed the time that defendant accessed certain computer files.  A computer expert testified about the accuracy of the computer clock when the records were made.  The defendant argued the computer records were inadmissible hearsay.  (*Id.* at pp. 1446–1447.)

*Hawkins* reviewed various cases that held computer printouts were admissible if they fell within the hearsay exceptions for business or official records.  However, *Hawkins* noted that "these cases have not discriminated among the different types of information that computers can print out.  *A computer can be used to store documents and information entered by human operators.  A computer can also be programmed to generate information on its own, such as a record of its internal operations.  Some jurisdictions have recognized that the latter type of computer-generated information is not hearsay because it is not a statement by a person.*"  (*Hawkins*, *supra*, 98 Cal.App.4th at p. 1449, italics added.)

*Hawkins* relied on this distinction to find that printouts of "computer-generated information," as opposed to "computer-stored information," were not hearsay based on the Evidence Code definitions. (*Hawkins*, *supra*, 98 Cal.App.4th at p. 1451.)

> " ' "Hearsay evidence" is evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' [Citation.] ' "Statement" means (a) oral or written verbal expression or (b) nonverbal conduct of a person intended by him as a substitute for oral or written verbal expression.' [Citation.] ' "Person" includes a natural person, firm, association, organization, partnership, business trust, corporation, limited liability company, or public entity.' [Citation.] *The Evidence Code does not contemplate that a machine can make a statement.*" (*Id*. at p. 1449, italics added.)

*Hawkins* agreed with cases from other jurisdictions that held automatically generated computer evidence was not hearsay:

> " 'The printout of the results of the computer's internal operations is not hearsay evidence. It does not represent the output of statements placed into the computer by out of court declarants. Nor can we say that this printout itself is a "statement" constituting hearsay evidence. The underlying rationale of the hearsay rule is that such statements are made without an oath and their truth cannot be tested by cross-examination. [Citations.] Of concern is the possibility that a witness may consciously or unconsciously misrepresent what the declarant told him or that the declarant may consciously or unconsciously misrepresent a fact or occurrence. [Citation.] *With a machine, however, there is no possibility of a conscious misrepresentation, and the possibility of inaccurate or misleading data only materializes if the machine is not functioning properly*.' [Citations.] 'The role that the hearsay rule plays in limiting the fact finder's consideration to reliable evidence received from witnesses who are under oath and subject to cross-examination has no application to the computer generated record in this case. Instead, the admissibility of the computer tracing system record should be measured by the reliability of the system, itself, relative to its proper functioning and accuracy.' [Citation.]" (*Hawkins*, *supra*, 98 Cal.App.4th at p. 1449.)[14]

---

[14] *Hawkins* further concluded that "the true test for admissibility of a printout reflecting a computer's internal operations is not whether the printout was made in the regular course of business, but whether the computer was operating properly at the time of the printout," referring to the foundational and authenticity issues discussed above. (*Hawkins*, *supra*, 98 Cal.App.4th at pp. 1449–1450.)

27.

Thus, data that is automatically generated by a computer is not hearsay because it is not a statement of a person. (*Goldsmith, supra*, 59 Cal.4th at pp. 273–274 [digital photographs automatically taken by a machine and data, such as date and time, which a computer automatically generates and imprints are not hearsay]; *Nazary, supra,* 191 Cal.App.4th at p. 754 [computer generated receipts, which show the date, time, and totals, are not statements inputed by a person].)

### 1. *Cases in Other Jurisdictions*

Similar distinctions about computer-generated data have been reached by courts in other jurisdictions. In *United States v. Lizarraga-Tirado* (9th Cir. 2015) 789 F.3d 1107 (*Lizarraga-Tirado*), an arresting officer used a GPS device to obtain the coordinates of the location where defendant was arrested. The court held that a Google Earth satellite image, created using those GPS coordinates, did not constitute hearsay. The court noted that a photograph was not hearsay because it "merely depicts a scene as it existed at a particular time. The same is true of a Google Earth satellite image. Such images are produced by high-resolution imaging satellites, and though the cameras are more powerful, the result is the same: a snapshot of the world as it existed when the satellite passed overhead. Because a satellite image, like a photograph, makes no assertion, it isn't hearsay." (*Id.* at p. 1109.)

*Lizarraga-Tirado* also held that "[a] tack placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay," because the relevant assertion "isn't made by a person; it's made by the Google Earth program. Though a person types in the GPS coordinates, he has no role in figuring out where the tack will be placed. The real work is done by the computer program itself. The program analyzes the GPS coordinates and, without any human intervention, places a labeled tack on the satellite image. Because the program makes the relevant assertion – that the tack is accurately placed at the labeled GPS coordinates – there's no statement as defined by the hearsay rule." (*Lizarraga-Tirado*, *supra*, 789 F.3d at pp. 1109–1110.)

28.

*Lizarraga-Tirado* concluded that evidentiary concerns about the machine itself would be addressed by the appropriate authentication. (*Lizarraga-Tirado*, *supra*, 789 F.3d at p. 1110; see also *United States v. Hamilton* (10th Cir. 2005) 413 F.3d 1138, 1142–1143 [computer generated header information on digital images, which showed date when images were posted, did not constitute hearsay]; *United States v. Khorozian* (3d Cir. 2003) 333 F.3d 498, 506 [information generated by a fax machine, including the date when the fax was sent, was not hearsay].)

In *State v. Kandutsch* (2011) 336 Wis.2d 478 [799 N.W.2d 865] (*Kandutsch*), the defendant was convicted of operating a motor vehicle "while under the influence of an intoxicant." (*Id*. at p. 482, fns. omitted.) His conviction was "based in large part upon inference from a report generated by an electronic monitoring device (EMD) that [the defendant] was wearing" (*ibid*.), that showed the defendant had been driving for approximately 20 minutes before he was stopped by the police and arrested for being heavily intoxicated. The defendant argued the report was hearsay. (*Ibid.*)

*Kandutsch* held the report generated from the defendant's electronic monitoring device was not hearsay. In doing so, the court similarly distinguished "between computer-stored records, which memorialize the assertions of human declarants, and *computer-generated records, which are the result of a process free of human intervention*." (*Kandutsch*, *supra*, 336 Wis.2d at p. 505, italics added.) As in *Hawkins*, the court held that computer generated records do not implicate the concerns of the hearsay rule "when the evidence is not the product of human intervention. [Citation.]" (*Kandutsch*, at p. 505).)

> "A record created as a result of a computerized or mechanical process cannot lie. It cannot forget or misunderstand. Although data may be lost or garbled as a result of some malfunction, such a malfunction would go to the weight of the evidence, not its admissibility. The record does not present the danger of being taken out of context, because the opposing party has a right to put it in context. [The law enforcement agent] perhaps summarized it best when she testified regarding the [Electronic Monitoring Device], 'It doesn't have a mind of its own, it's a computer

device, it's a high-tech device, it reports things when they happen.' "
(*Ibid.*, fns. omitted.)

*Kandutsch* concluded that since the report about defendant's movements "was generated as 'the result of an automated process free of human intervention,' it was not hearsay," and the evidence was admissible since the general authentication requirements were satisfied through the testimony of two law enforcement officers. (*Kandutsch*, *supra*, 336 Wis.2d at p. 506; see also *Commonwealth v. Thissell*, *supra*, 457 Mass. 191 [928 N.E.2d 932]; *Commonwealth v. Royal* (2016) 89 Mass.App.Ct. 168, 171–172 [46 N.E.3d 583] [similarly relying on the distinction between "computer-generated" as compared to "computer-stored" records for hearsay analysis].)

### 2. *Analysis*

The computer-generated report of the GPS data generated by defendant's ankle monitor did not consist of statements of a person as defined by the Evidence Code, and did not constitute hearsay as statutorily defined. The ankle monitor automatically sent signals of defendant's location to the GPS, which automatically generated the computer data about defendant's location at the specific dates and times, so that there was "no statement being made by a person regarding the data information so recorded." (*Goldsmith*, *supra*, 59 Cal.4th at p. 274; *Hawkins, supra,* 98 Cal.App.4th at p. 1449; *Nazary, supra,* 191 Cal.App.4th at pp. 754–755; *Dawkins*, *supra*, 230 Cal.App.4th at p. 1004.)

Defendant argues that the GPS report in this case was not automatically generated by a computer because Sergeant Kessler testified the data was subject to manipulation by the deputies who had access to the GPS software. As explained above, however, Sergeant Kessler testified that the deputies could enter information into an inmate's electronic file about his curfew, schedule, and contacts with them, and they could not delete those notes. More importantly, Kessler testified the deputies could not alter or manipulate someone's actual location or the GPS location data transmitted by the ankle

30.

monitor and depicted in the computer.  "We cannot change the points and those are longitude/latitude points that are made."

Defendant next contends that testimony about the identification number on defendant's ankle monitor, that connected him to the report about the GPS data, also consisted of hearsay.  At the evidentiary hearing, defendant raised two foundational evidentiary objections:  that the printed report about the GPS data was hearsay, and it was not properly authenticated.  However, defendant never raised any hearsay or evidentiary objection about how the sheriff's department identified him as the person wearing the ankle monitor that generated the GPS data contained in the report.

By failing to object below, defendant deprived the prosecution of the opportunity to introduce evidence on this point and has thus waived the hearsay claim.  (*People v. Bolin* (1998) 18 Cal.4th 297, 320; *People v. Blacksher* (2011) 52 Cal.4th 769, 797.)  If such an objection had been made, the People could have called Deputy Patterson to testify at the evidentiary hearing in a manner consistent with his subsequent trial testimony, that he personally attached the ankle monitor to defendant, and read aloud the identification number on that device that corresponded to the GPS report.  Patterson would have been available for cross-examination as to the correctness of the identification number on defendant's ankle monitor and the number stated in the GPS report.  (Cf. *People v. Lopez* (2012) 55 Cal.4th 569, 583.)

We further note that defendant also waived any hearsay objection on this point based on a stipulation that he agreed to, and that was read to the jury at the end of the trial:  that when defendant was arrested and taken into custody, ankle monitor No. NF0002048 was secured to his ankle.

Finally, defendant argues that the computer-generated report of GPS data was also inadmissible because it constituted testimonial hearsay within the meaning of *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305.  We have already found the evidence was not hearsay.  In addition, it was not "testimonial" because it was originally transmitted

from the ankle monitor to the Kern County Sheriff's Department to administer defendant's release pursuant to the EMP, and was thus "created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial …." (*Id*. at p. 324.)

## II.    *Admission of Additional GPS Data**

Defendant was charged with escape on December 28, 2012, when the GPS data showed he was in Monrovia in Southern California.  Defendant contends the court erroneously admitted the deputies' testimony about his locations on days other than the charged offense, based on the GPS data, and argues such evidence was irrelevant and highly prejudicial propensity evidence, which the prosecution exploited in closing argument.  The People assert that defendant waived any objection to this evidence.

As we will explain, defendant preserved his initial objection but subsequently failed to request any limiting instructions and did not object to closing argument.

### A.    **Pretrial Hearing**

As noted above, defendant filed a pretrial motion with numerous evidentiary objections, including his primary argument that the report about the GPS data constituted inadmissible hearsay.

As a separate objection (identified as No. 14) defendant's motion also moved to exclude any evidence that he was not in Kern County on dates other than the charged offense of December 28, 2012.  Defendant argued evidence that he left Kern County on other dates was irrelevant and inadmissible character evidence under section 1101, subdivision (a).

It appears that the court and parties addressed some of the motions in limine prior to the pretrial evidentiary hearing and off the record.  At the beginning of that hearing,

---

* See footnote 1, *ante*, page 1.

the court advised defendant that "we were just discussing some of the legal issues that arise during trial, so we are going to go over those this morning."

The court continued by reviewing each of the parties' motions. When the court reached defense objection No. 14, about the admission of GPS data on dates other than the charged offense, it asked defense counsel if she wanted to make any comments.

Defense counsel replied that she did not want to "rehash the written arguments" in her motion, but stated that the People wanted to introduce evidence about defendant's whereabouts in January and February 2013. Counsel stated that if the court was going to allow in evidence of defendant's location on days other than December 28, 2012, "my request would be that all of the information regarding [defendant's] whereabouts per the GPS logs be allowed into evidence" and "the jury should know about simply limiting [defendant's] locations on only certain dates doesn't tell the jury the full story. And I believe they deserve to know all of the relevant information regarding the escape charge in this case."

The court replied: "So Number 14 is denied. The understanding is if the evidence does come in, then all dates would be relevant. Obviously, if it was not permitted to be introduced, it would not be at issue."

At the evidentiary hearing, Sergeant Kessler testified as set forth above. After his testimony, the parties argued whether the GPS data was hearsay and properly authenticated. The court held the report was not hearsay and that the GPS evidence was admissible. It did not specifically address the admissibility of the GPS data about the other dates that defendant left Kern County.

## B. Trial Evidence and Instructions

As set forth in the factual statement, *ante*, the prosecution introduced evidence that defendant left Kern County and California on dates other than the charged offense.

The court instructed the jury prior to closing arguments. The court gave CALCRIM No. 2760 on the elements of the charged offense of escape.

33.

"The defendant is charged with escape.

"To prove that the defendant is guilty of this crime, the People must prove that:

"One, the defendant was a prisoner who had been convicted of a felony;

"Two, the defendant was confined in a county jail but was authorized to be away from the place of confinement in connection with an Electronic Monitoring Program;

"And, three, the defendant escaped from the place of confinement while in the electronic monitoring program.

"Escape means the unlawful departure of a prisoner from the physical limits of his or her custody.

"A prisoner also escapes if he or she willfully fails to return to his or her place of confinement within the period that he or she was authorized to be away from that place of confinement. Someone commits an act willfully when he or she does it willingly or on purpose."

The court also gave CALCRIM No. 370 on motive.[15]

"The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict, you may, however, consider whether the defendant had a motive.

"Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

## C.   Closing Arguments and the Unanimity Instruction

In her closing argument, the prosecutor stated defendant violated the terms of his EMP release "over and over and over again." The prosecutor argued the jury instructions set forth "two different types of escape so you could have one or the other. You could

---

[15] The prosecutor requested the motive instruction as relevant to the escape charge. Defense counsel objected and argued there was no evidence of motive, and it was not a disputed question for the jury to consider. The prosecutor replied that there was "a lot of evidence" that showed defendant "willfully disobeyed his orders to return home based on employment or whatever he was doing out of state." The court overruled defense counsel's objection and gave the motive instruction.

have both if you'd like."  The first form of escape was an inmate's unlawful departure from the physical limits by leaving Kern County without receiving permission; and the second form was willfully failing to return to his or her place of confinement within the appropriate time period.

The prosecutor reviewed the entirety of the GPS data, and argued that it showed defendant left Kern County not once or twice, but "over and over and over."  On December 28, 2012, he was "caught" in Monrovia by Deputy Veon, who called defendant and told him that he was not allowed to leave Kern County or California.  Despite this warning, defendant continued to leave for the following weeks, and went to Arizona and Texas.  The prosecutor argued defendant was an inmate who was required to abide by the rules of his EMP release, but he continued to violate even after being warned.  "This is not someone who is complying with his program.  This is not someone who is abiding by the rules."  Instead, defendant "willfully decided to abscond from the limits of his ankle monitoring program."[16]

Defense counsel argued defendant did not intend to escape but merely engaged in his job as a long-haul truck driver, and it was "made pretty clear" to the deputies that defendant's job required him to leave Kern County and California.  Counsel reviewed the entirety of the GPS data, that showed defendant always returned to his home in Bakersfield.  Counsel argued Deputy Patterson may not have explained all the terms of the EMP release, and defendant lacked the intent to escape because he remained in Bakersfield for lengthy periods of time and was wearing the ankle monitor when he was taken into custody.

In rebuttal, the prosecutor argued that defendant was released pursuant to the EMP's terms, and he continued to leave Kern County without permission even after he was advised that he could not do so.

---

[16] Defense counsel did not object to any part of the prosecutor's closing argument.

35.

### *Unanimity Instruction*

After the parties' arguments, the court addressed the attorneys outside the jury's presence and stated that it was going to give the unanimity instruction to the jury. The court stated the unanimity instruction was appropriate because "we got not only the leaving on [December] 28th," but there were also "multiple acts to prove a single count." Neither party objected.

Thereafter, the court gave the jury CALCRIM No. 3500:

"[T]he defendant is charged with escape on or about December 28, 2012.

> "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act he committed."

### D. Defendant's Initial Objection

On appeal, defendant argues that the court improperly permitted the deputies to testify about his whereabouts on days other than on December 28, 2012, which was the basis for the charged offense of escape. The People respond that defendant waived any objection to this evidence because defense counsel "requested that all of the other instances be admissible. Apparently realizing that the trial court was set to permit the prosecutor to present several dates [defendant] was outside of Kern County other than December 28, defense counsel then asked that every date included in the GPS data be admissible." In his reply brief, defendant asserts that he preserved his objection to this evidence, and "only asked for all GPS data to be given to the jury after the court denied his motion in limine seeking to limit the data to the relevant date of his alleged violation."

We reject the People's argument that defendant withdrew his initial objection to the entirety of the GPS evidence. As set forth above, defendant's pretrial motion in limine raised an objection to the introduction of any evidence that he left Kern County on any dates other than the charged offense.

At the pretrial hearing, it was apparent that the court discussed the evidentiary objections with the parties off the record. In doing so, the court indicated that it was going to admit the evidence that defendant left Kern County on other dates, if it found the GPS data was otherwise admissible. At that point, defendant requested to admit the entirety of the GPS data to support the defense theory that defendant never intended to escape because he always returned to Kern County. Defendant's strategic decision did not amount to a waiver in light of the court's evidentiary ruling.

We thus find that defendant preserved his initial objection to this evidence.

### E.      Failure to Request Instructions or Object to Closing Argument

Defendant argues the court failed to address his pretrial objections that evidence of his other violations constituted improper character and propensity evidence, explained why the evidence was admissible, or determined whether the evidence was prejudicial under section 352. While defendant preserved his initial objection, this conclusion does not end our analysis.

Section 1101, subdivision (a) prohibits the admission of evidence of uncharged offenses to prove propensity or disposition to commit the charged crime. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393; *People v. Hendrix* (2013) 214 Cal.App.4th 216, 238.) "Evidence of other crimes is admissible, however, when relevant for a noncharacter purpose – that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as 'motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake [of fact] or accident.' [Citations.]" (*People v. Hendrix*, *supra*, 214 Cal.App.4th at p. 238; § 1101, subd. (b).)

Motive is generally not an element of a criminal offense. (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1126.) However, " ' "when the commission of a criminal act [(the crime for which defendant is on trial)] is a disputed issue, evidence of *motive* may become relevant to that issue. Motive is itself a state-of-mind or state-of-emotion fact. Motive is an idea, belief, or emotion that impels or incites one to act in accordance

37.

with his state of mind or emotion. Thus, evidence, offered to prove motive, that defendant committed an uncharged offense meets the test of relevancy by virtue of the circumstantial-evidence-reasoning process that accepts as valid the principle that one tends to act in accordance with his state of mind or emotion." [Citation.]' [Citations.]" (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1382–1383, italics added in original.)

In this case, the court instructed the jury on motive, which strongly suggests that the court found defendant's violations of the EMP program, on dates other than the charged offense, were relevant for a noncharacter purpose. Defendant objected to the motive instruction and argued it was not a disputed question for the jury. The court overruled the objection, presumably in agreement with the prosecutor's argument that there was "a lot of evidence" that showed defendant "willfully disobeyed his orders to return home based on employment or whatever he was doing out of state." The court did not abuse its discretion with this ruling.

Defendant argues the court never considered the prejudicial impact of this evidence under section 352. As we have already noted, the record implies that the court may have addressed the admission of this evidence off the record. In any event, we cannot say that the probative value of the other EMP violations was substantially outweighed by the risk of undue prejudice, and the evidence was no more inflammatory than the charged offense. (§ 352; *People v. Zepeda* (2001) 87 Cal.App.4th 1183, 1211; *People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) In addition, defense counsel relied on the entirety of the GPS data to argue defendant never intended to escape since his travel patterns were consistent with his job as a long-haul trucker, he always returned to his Bakersfield residence, and he may have misunderstood the terms and conditions of his EMP release.

Defendant further argues the admission of this evidence was prejudicial because the court did not place any restrictions on its admissibility. Except in extraordinary circumstances, a trial court does not have a sua sponte duty to instruct on the limited

admissibility or use of other-crimes evidence, but must give such an instruction only upon request. (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1094; *People v. Falsetta* (1999) 21 Cal.4th 903, 924; *People v. Cottone* (2013) 57 Cal.4th 269, 293.) While the court overruled defendant's objections to the GPS data and the motive instruction, defendant did not request any type of limiting instruction in this case and the court was not required to give one on its own motion. However, the court's decision to give the unanimity instruction acted as a further safeguard to ensure the jury would properly consider the evidence about the entirety of the GPS data.

Defendant asserts the prosecutor used closing argument to improperly describe defendant's repeatedly EMP violations as propensity evidence, by stating that defendant failed to comply with the EMP rules "over and over and over again." Defendant's appellate claim raises an allegation of prosecutorial misconduct. However, defendant never objected to any part of the prosecutor's closing argument. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion – and on the same ground – the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.) The failure to object and request an admonition "waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective. [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 160; *People v. Hill* (1998) 17 Cal.4th 800, 820.)

In any event, the prosecutor's argument did not stray beyond the bounds of the motive instruction, and she asserted that defendant's continued travels outside of Kern County and California, and failure to comply with the order to call the supervising deputy for permission, showed his motive and intent to violate the terms and conditions of his EMP release, rather than a misunderstanding about where he could work.

Finally, defendant argues the court violated his due process rights by admitting evidence of the other violations. The admission of evidence, even if erroneous under

state law, must make the trial fundamentally unfair as to result in a violation of due process.  (*People v. Partida* (2005) 37 Cal.4th 428, 439.)  Defendant has failed to demonstrate the evidence of the other violations was so unfair as to deprive him of due process.  Accordingly, defendant's due process challenge fails.

## DISPOSITION

The judgment is affirmed.

_____
POOCHIGIAN, J.

WE CONCUR:


_____
LEVY, Acting P.J.


_____
SMITH, J.